**F I L E D**

**PUBLISH**

**June 24, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 04-3113

JOHN STEVENS HAUK,

Defendant-Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 03-CR-20066-01-CM)**

---

Michael L. Harris, Assistant Federal Public Defender, Kansas City, Kansas, for Defendant-Appellant.

Leon J. Patton, Assistant United States Attorney (Eric F. Melgren, United States Attorney, and Robert S. Streepy, Assistant United States Attorney, on the briefs), Kansas City, Kansas, for Plaintiff-Appellee.

---

Before **LUCERO**, **MURPHY**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Defendant-Appellant John Stevens Hauk appeals the district court's denial of his motion to suppress evidence discovered as a result of a protective sweep of his residence. Mr. Hauk argues that the police lacked reasonable suspicion for the protective sweep because it was based on uncorroborated information in an anonymous tip. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's denial of Mr. Hauk's motion to suppress. However, on plain error review, we conclude that Mr. Hauk's sentence violated his Sixth Amendment rights under *United States v. Booker*, 125 S.Ct. 738 (2005), and we exercise our discretion to VACATE the sentence and REMAND to the district court for resentencing.

## I.

On April 2, 2003, an anonymous caller informed the FBI Violent Crimes Fugitive Task Force ("the Task Force") that Mr. Hauk was selling illegal drugs out of his house at 5050 Walker in Kansas City, Kansas. The record does not contain any description of the caller, nor does it include a transcript or recording of the call. The only record of the call is a tip sheet, which states:

> Caller states that subject lives at the residence and has large quantities of drugs in the home. Caller states that there is drugs in the ceiling, hall closet by the bedroom, night stand next to the bed and in a duffle bag in the closet. He also has scales in the bedroom. The drugs that he has are cocaine, crack and marijuana. Subject sleeps in the day time and is up at night selling. He has no dogs at his location but does have guns in the home. Caller also states that he is a parole violator and has warrants. He also has a "runner" who goes by the name of Spencer. He drives a red Chevy Astro van. Caller states that he has been in the home and does get drugs from him.

Motion to Suppress, R. Vol. I, Doc 19, 1–2. After he received this information,

Detective Michael Shomin of the Kansas City, Kansas Police Department confirmed an outstanding state warrant for Mr. Hauk's arrest for violation of parole. He also obtained a photograph of Mr. Hauk.

On the following day, a number of Task Force officers set up surveillance of 5050 Walker. A group of officers met near the residence to plan an approach to arrest Mr. Hauk. Before the approach began, a member of the surveillance team informed Detective Shomin that a red Camaro had pulled into Mr. Hauk's driveway. The officer could not describe the driver or tell where he had gone, but he thought that he might have entered the house.

Shortly thereafter, Task Force members surrounded the residence, and Detective Shomin and another officer knocked on the front door. After a few minutes, Mr. Hauk answered the door in his boxer shorts. Recognizing his callers as police officers, Mr. Hauk immediately tried to close the door. The officers forced their way into the house and arrested Mr. Hauk immediately inside the front door. Detective Shomin and other officers then fanned out through the house to conduct a protective sweep, which lasted approximately five to ten minutes. During the sweep, the officers saw what appeared to be illegal drugs in several locations in the house.

On the strength of their observations during the protective sweep, the police obtained a search warrant for Mr. Hauk's residence. During the ensuing search, the police discovered a large quantity of cocaine and marijuana in Mr. Hauk's room,

marijuana and a scale with white powder residue in the living room, and a suitcase containing crack cocaine and a firearm in the second bedroom. Based on the items seized from his house, the Grand Jury for the District of Kansas returned a two-count indictment charging Mr. Hauk with possession with intent to distribute 50 grams or more of a mixture or substance containing cocaine base and possession with intent to distribute 500 grams or more of a mixture or substance containing cocaine hydrochloride, each in violation of 21 U.S.C. § 841(a)(1).

Mr. Hauk moved to suppress the evidence, arguing that the protective sweep constituted an illegal search of his house. The district court denied the motion to suppress, finding that "there were articulable facts which rationally led the agents to the reasonable conclusion that another individual, whether a narcotics customer or Mr. Spencer, might be in the home and might pose a danger to the arresting officers." Mr. Hauk entered a conditional guilty plea to count two, reserving his right to appeal the denial of his motion to suppress.

## II.

Mr. Hauk argues that the protective sweep was unlawful because the arresting officers lacked reasonable suspicion that a third party posing a danger to the officers was present in the house. If the protective sweep was unlawful, then the police officers' observations of drugs in the house could not have been used to support the search warrant, and the products of the ensuing warranted search must be suppressed.

We review the district court's findings of fact on a motion to suppress for clear error, viewing the evidence in the light most favorable to the government, but the ultimate determination of reasonable suspicion or probable cause is a mixed question of law and fact that we review de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005). The parties agree on the relevant facts; therefore, we consider only the legal question whether the protective sweep was justified by reasonable suspicion. *See Maryland v. Buie*, 494 U.S. 325 (1990). We are free to affirm the district court's decision on any ground supported by the record. *United States v. Esparza-Mendoza*, 386 F.3d 953, 957 (10th Cir. 2004).

A challenge to a search necessarily begins with the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. When they first accosted Mr. Hauk at his home, the police had a warrant for Mr. Hauk's arrest. They did not (at that time) have a warrant to search the house. An arrest warrant, however, "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. United States*, 445 U.S. 573, 603 (1980).

5

In *Maryland v. Buie*, the Supreme Court recognized an exception to the warrant requirement for a cursory, limited search of a residence incident to arrest—a so-called protective sweep—if the circumstances present "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 334. This is essentially the same "reasonable suspicion" standard that justifies the warrantless frisk of an individual or the warrantless search of a vehicle's passenger compartment incident to the driver's arrest. *Id.* at 332–34; *see also Terry v. Ohio*, 391 U.S. 1 (1968) (warrantless frisk); *Michigan v. Long*, 463 U.S. 1032 (1983) (search of passenger compartment). Reasonable suspicion requires the officer to act on "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). Reasonable suspicion may be established by information that is "different in quantity or content" and less reliable than the information required to establish probable cause. *Alabama v. White*, 496 U.S. 325, 330 (1990).

**A.**

Appellant argues that rather than being based on specific, articulable facts, the protective sweep of his home was based on "generalizations by [the officers] about drug offenders, their use of weapons, and their use of other people," and that the police officer conceded in his testimony that the sweep "would have

6

occurred regardless of the information in the anonymous tip." He thus argues that the search failed the constitutional standards for protective sweeps set forth in *Buie*. The testimony to which Appellant refers is that of Detective Michael Shomin:

> Q: So I take it then it is just a matter of routine when you are executing arrest warrants at a particular residence, that a protective sweep then is done, because in your experience, there is at least some likelihood that some other person might be present, correct?
>
> A: Absolutely.
>
> Q: So, as a general policy of the police department, when you folks effect an arrest warrant, you routinely do a protective sweep regardless, right?
>
> A: For officer safety, absolutely.

Testimony of Detective Michael Shomin, R. Vol. II, 22:10–19.

The Fourth Amendment does not sanction automatic searches of an arrestee's home, nor does the fact-intensive question of reasonable suspicion accommodate a policy of automatic protective sweeps. Given the specific mission of the Task Force to apprehend violent fugitives, it may be that its arrests involve a heightened level of danger. If this is the case, the circumstances of each arrest might well create reasonable suspicion sufficient for a protective sweep. Applied indiscriminately to all arrest warrants, however, the Kansas City policy sweeps too broadly. For example, a routine protective sweep would presumably be inappropriate if conducted by officers serving a warrant for a traffic ticket or

7

securities fraud. *Cf. Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) ("The . . . *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place."); *Denver Justice & Peace Committee, Inc. v. City of Golden*, ___ F.3d ___, 2005 WL 950648 (10th Cir. April 26, 2005) (rejecting the argument that officer safety and general efficiency authorize the police to frisk, without reasonable suspicion, any person who enters an area where a search warrant is being executed).

Neither do we endorse the Task Force's practice of automatic protective sweeps based on the assumption that "drug houses" are inherently dangerous. Detective Shomin testified that drug houses are, in his experience, places of violence, and this is no doubt true. However, given the Supreme Court's general disinclination to carve out subject-matter-specific exceptions from the Fourth Amendment, *see, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 272–73 (2000) (rejecting a firearms exception to the Fourth Amendment and suggesting that a narcotics exception would be equally improper); *Mincey v. Arizona*, 437 U.S. 385 (1978) (rejecting a "murder scene exception" to the Fourth Amendment), its rejection of a "felony drug investigation" exception to the knock-and-announce rule, *see Richards v. Wisconsin*, 520 U.S. 385, 391–94 (1997), and the malleability of the concept of a "drug house," we decline to endorse the suggestion that the Fourth

Amendment accommodates a "drug house" exception. We note also that, even if "drug houses" were categorically eligible for protective sweeps, police would require specific, articulable facts to support reasonable suspicion that a given building is a "drug house."

If the government were relying on the validity of the Kansas City policy to support this protective sweep, or if the subjective motivations of the officers in undertaking the sweep were controlling, we would thus have to reverse this conviction. In light of Detective Shomin's testimony, there is every reason to believe that the police engaged in the sweep of Mr. Hauk's residence not because they believed they had reasonable suspicion of danger, but because they were executing a "general policy" of conducting protective sweeps in the course of all arrests within a home. But the Supreme Court has squarely held that the legality of searches and seizures under the Fourth Amendment depends not on the subjective motivations of the police, but on whether there was an objectively reasonable basis for the search or seizure. *United States v. Whren*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *see also United States v. Ben Abdenbi*, 361 F.3d 1282, 1292-93 (10th Cir.), *cert denied*, 125 S. Ct. 197 (2004) (holding that the subjective intentions of the officer are irrelevant to the question whether an individual consented to an encounter with the police). Thus, the question here is

9

not why the officers conducted the protective sweep of Mr. Hauk's home (apparently the answer to that is that they were following standard procedures), but whether the totality of the circumstances established a reasonable basis for them to do so. Resolving that question requires an examination of the anonymous tip that gave rise to the encounter, as well as the other circumstances that gave rise to suspicion that the officers were in danger when they were inside Mr. Hauk's home making the arrest.

We note, though, that the actual, subjective motivations of the police officers in conducting the sweep may have relevance to the degree of deference the district court should accord the officer's professional experience and judgment regarding whether reasonable suspicion of danger existed. Ordinarily, as the Supreme Court has instructed, district courts must accord "due weight" to the judgments of police officers on the ground that their "experience and specialized training" may allow them "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Santos*, 403 F.3d at 1133. Where, however, there is reason to believe that the officers conducted the search not on the basis of the particular facts of the case but on some other grounds, such as standard operating procedure, the inference that the judgment reflected their superior training and experience is

10

correspondingly weakened, and the "due" weight given their judgment is correspondingly less. *Cf. Santos*, 403 F.3d at 1126 (explaining, in a case where a motorist's refusal of consent to search may have precipitated his detention in the course of a traffic stop, that the "due weight" given to the district court's inferences "is substantially diminished when there is reason to believe those inferences were affected by an illegitimate consideration").

**B**.

When the articulable facts supporting reasonable suspicion come from an informant, the police must have an objective basis to rely on the tip. If anonymous, uncorroborated tips were deemed a sufficient basis for search, malicious informants could use the device of a phoney tip to wreak injury (indignity, invasion of privacy, suspicion, and sheer annoyance) on their enemies, rivals, or acquaintances without fear of being held responsible. *See United States v. Johnson*, 364 F.3d 1185, 1190–91 (10th Cir. 2004). Even if the informant is well-meaning, reliance on anonymous uncorroborated tips could result in searches based on far less than an objective reasonable basis. If in Mrs. Grundy's fertile imagination, the innocent doings of her neighbors assume the aspect of dire criminality, her report of her conclusions to the police does not mean that a reasonable basis for suspicion exists. Information is only as good as its source, and if police do not know the source and have no other means for verifying the information, the mere fact that an anonymous tipster thinks there is mischief afoot

11

is not a sufficient basis for police action.

When police obtain "sufficient independent corroboration," however, even an anonymous tip generally provides a basis for reasonable suspicion. *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). By corroborating predictive information in an anonymous tip, police officers "test the informant's knowledge and credibility," getting some assurance that the tip is reliable. *United States v. Tuter*, 240 F.3d 1292, 1297 (10th Cir. 2001) (quoting *J.L.*, 529 U.S. at 271). Police are entitled to rely on corroborated anonymous tips "because [if] an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." *White*, 496 U.S. at 331.

In *Alabama v. White*, for example, an anonymous caller informed the police that the suspect would leave a specific apartment at a particular time, that she would drive a brown Plymouth station wagon with a broken right tail light to a particular motel, and that she would be carrying cocaine in a brown leather case. *Id.* at 327. The officer who received the tip drove to the apartment mentioned in the tip, where he saw the suspect come out of the building, with nothing in her hands, and get into a brown Plymouth station wagon with a broken right tail light. The officer followed the suspect while she drove "the most direct route" to the motel mentioned in the tip. The officer stopped the suspect before she reached the motel. The suspect consented to a search of her vehicle, which revealed

12

marijuana and a small amount of cocaine. Though it characterized *White* as a "close case," the Supreme Court held that corroboration of the predictive information in the tip created reasonable suspicion for the initial stop. *Cf. Illinois v. Gates*, 462 U.S. 213, 244-46 (1983) (finding a search warrant based on an anonymous tip to be supported by probable cause when the police confirmed the tip's prediction of the suspect's flight information, destination, and details about his return trip); *United States v. Hinojos*, 107 F.3d 765 (10th Cir. 1997) (upholding a traffic stop based on an anonymous tip because the informant predicted the suspect's route of travel through Oklahoma, claimed to have observed the suspect's activities directly, and passed the tip to a particular Kansas DEA agent, suggesting a preexisting relationship).

Generally, to be sufficient to support an inference of credibility and reliability, the corroborated information must be "predictive" in nature. Predictive information is defined broadly as knowledge that the informant could not acquire from any source but the suspect, whether directly or indirectly, providing reason to believe that the informant has "inside information—a special familiarity with [the suspect's] affairs," and is not just a member of the "general public." *White*, 496 U.S. at 332. In *Florida v. J.L.*, an anonymous caller reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. Officers went to the bus stop,

13

where they saw J.L., a young black male wearing a plaid shirt. An officer approached J.L., told him to put his hands up, and frisked him, finding a gun in his pocket. *Id.* The Court held that the tip "lacked the moderate indicia of reliability present in *White*" because the tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271. The Court rejected the argument that "accurate description of a suspect's readily observable location and appearance" was sufficient to justify reliance on the tip because it "does not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272.

Reliance on an anonymous tip is justified when the tip contains "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Gates*, 462 U.S. at 245, *quoted in White*, 496 U.S. at 332. Even if the facts corroborated are themselves innocent, as in *Gates* and *White*, they may show the informant to be a reliable source of information not available to the public or the police, not merely a neighbor with ulterior motives or an active imagination.

Corroboration of information other than predictive facts, such as the basis of the informant's knowledge, the circumstances under which it was obtained, and the amount of detail about the alleged criminal activity, can also justify reliance on an anonymous tip in appropriate circumstances. *See Gates*, 462 U.S. at 234

14

("[I]f we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.").

We stress that this case involved a protective sweep, rather than an investigative detention or search, like that in *White* and *J.L.*, and thus presents somewhat different legal considerations. In the investigative detention cases, reasonable suspicion must support both steps in the encounter—the investigative detention and the ensuing search. The *J.L.* Court expressly limited its holding to cases in which the officer relies on the tip to make the initial stop:

> [T]he requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with *Terry*, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue.

*J.L.*, 529 U.S. at 274. An arrest warrant gives the police unquestioned authority to detain the suspect. Reasonable suspicion is required only for the second step, the protective sweep. This step is less intrusive than the first. The suspect has already been seized under authority of a warrant, and if he has been arrested in his house, the threshold of the home has already been breached. *Cf. Payton*, 445 U.S. at 585 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). As a protective measure incident to a

15

valid seizure, a protective sweep incident to arrest therefore does not intrude on a suspect's Fourth Amendment rights to the same extent as an investigatory detention. Moreover, a tip leading to a protective sweep incident to a lawful arrest is a less propitious vehicle for the malicious tipster: because the target is already placed under arrest, the marginal gain to the tipster in terms of the increased indignity, invasion of privacy, or annoyance factor is substantially diminished. Thus, in examining the protective sweep that took place in this case, we have no need to determine whether the evidence would be sufficient to justify an investigatory detention or search.

## C.

Let us turn, then, to the anonymous tip in Mr. Hauk's case. The tip contained four different types of information: (1) identification of Mr. Hauk as a parole violator with outstanding warrants, together with his address; (2) information that he sleeps during the day and has no dogs; (3) information regarding the whereabouts in the house of drugs, drug sales equipment (scales), and guns; and (4) information that he has an associate named "Spencer" who drives a red Chevy Astro van.[1]

---

[1]The tip is ambiguous regarding which of the two men, Hauk or Spencer, drives the van, but because the preceding sentence in the tip sheet refers to Spencer, it is more likely (and certainly objectively reasonable to assume) that the "he" in the next sentence refers to Spencer.

The first category of information—identification of Mr. Hauk as a parole violator, and his address—is not precisely "predictive" information, but it indicates more than casual observation. General information, such as the suspect's address or the make of the suspect's vehicles, "is clearly insufficient for probable cause or even reasonable suspicion." *United States v. Jenkins*, 313 F.3d 549, 555 (10th Cir. 2002). As we observed in *United States v. Tuter*, "Almost anyone can describe the residents of, and vehicles at, a particular home without having any special knowledge of what goes on inside the home." 240 F.3d at 1297. But knowledge that Mr. Hauk was a parole violator with outstanding warrants suggests something more than casual observation by a member of the general public. To be sure, without remarkable exertion, a tipster might well learn of Mr. Hauk's status as a parolee. *See* Kansas Department of Correction, Kansas Adult Supervised Population Electronic Repository, *at* http://docnet.dc.state.ks.us (Offender Search). But knowledge of parole violations and outstanding warrants is more difficult to come by, in the absence of acquaintance with the suspect and more intimate familiarity with his affairs. The police corroboration of this information therefore provides some basis for judging the credibility and reliability of the tip.

The second category of information, that Mr. Hauk sleeps during the day and has no dogs, is "predictive" both in the ordinary sense (it is a prediction that

17

during the day, Mr. Hauk will be sleeping and will be unaccompanied by man's best friend) and in the more general sense that it is information unlikely to be known by the general public. *White*, 496 U.S. at 332; *Gates*, 462 U.S. at 245. The information was corroborated when the officers arrived during the day and were met at the door, several minutes after they knocked, by Mr. Hauk clad only in his boxer shorts, with no dog in evidence. His state of undress supported a reasonable (though of course not certain) inference that he had been in bed. This corroboration thus lends a bit more weight to the tip—but not much, since the facts of diurnal sleep and doglessness are not uncommon and do not require much in the way of observation.

The third category of information—location of drugs, drug scales, and guns—is predictive in the sense of not being known to the general public, and would be highly supportive of the reasonableness of the protective sweep if it were reliable. But this portion of the tip was completely uncorroborated. We do not find that the corroboration of the rest of the tip was sufficiently powerful to carry with it a reasonable basis for accepting the credibility and veracity of this portion. On the other hand, the information is highly detailed, reporting the presence of drugs "in the ceiling, hall closet by the bedroom, night stand next to the bed and in a duffle bag in the closet," along with "scales in the bedroom." Moreover, the tipster claimed to be reporting first hand information, which he

18

gleaned from being inside the house in the course of purchasing drugs from Mr. Hauk. ("Caller states that he has been in the home and does get drugs from him.") This degree of detail, claim of first-hand knowledge, and information about the circumstances of learning the information, lends weight to the credibility of the tip. *See Gates*, 462 U.S. at 234. These factors distinguish the tip in question from the anonymous calls in *J.L.* and *White*, which did not indicate the basis of the informant's knowledge. In this case, however, we need not resolve whether this portion of the tip, in isolation, could support reasonable suspicion. We find only that the totality of the circumstances supports the reasonableness of the protective sweep.

The fourth category of information in the tip—that Mr. Hauk had an associate named "Spencer" who drove a red vehicle—is ultimately the most important. To be sure, for an anonymous tip to support reasonable suspicion, the tip must "be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272 (emphasis added). There is nothing illegal in the State of Kansas about having an associate named Spencer, even assuming he drives a red car. But in conjunction with other events that took place the day of the arrest, this information powerfully supported an inference that there was another man in the house who might have reason to assist Mr. Hauk in resisting arrest, and pose a danger to the officers.

19

On the day of the arrest, as they approached Mr. Hauk's residence, the police had not only the knowledge of the allegations in the anonymous tip, but also an arrest warrant for Mr. Hauk for violating parole on a drug trafficking conviction. That gave the Task Force officers reason to suspect that Mr. Hauk might be involved with illegal drugs, and that he might be less than exemplary in his compliance with the lawful commands of law enforcement. Unlike some other crimes, involvement in the drug trade is not uncommonly associated with violence. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 1002–03 (1991) (citing studies demonstrating "a direct nexus between illegal drugs and crimes of violence"). This would put any reasonably prudent police officer, executing an arrest warrant for a drug offense parole violator, on his guard.

While they were waiting outside the residence, a red Camaro pulled into Mr. Hauk's driveway. The driver disappeared, perhaps into the house, though the officers could not see where he had gone. The unidentified driver's apparent entry into Mr. Hauk's house without knocking or requiring permission to enter gave the police reason to think that the driver was either the householder or a close associate, perhaps the runner. When Mr. Hauk appeared at the door shortly thereafter in boxer shorts, it seemed to confirm that the man who emerged from the vehicle was someone other than Mr. Hauk, on the assumption that it is unusual for a person to enter his house and immediately disrobe. The police therefore had

20

a reason to suspect that there was an unidentified person lurking somewhere in the house.

Mr. Hauk's effort to retreat into his house reinforced the officers' reasonable suspicion that the situation was dangerous. At the very least, forcible resistance by the subject of a warrant justifies an officer's suspicion that the arrestee has not given up on crime. *Cf. Illinois v. Wardlow*, 528 U.S. 119 (2000) (holding that the defendant's unprovoked flight from police officers in a high crime area created reasonable suspicion for a *Terry* stop). Depending on the facts known to the officer, it may suggest a great deal more. Based on the tip and the warrant, the officers had reason to suspect that Mr. Hauk was selling illegal drugs. Mr. Hauk's attempt to slam the door on the officers gave them reason to suspect that *something* was going on in the house that Mr. Hauk did not want them to see and that any third party in the house might also resist their efforts to serve the warrant.

Viewed as a totality, the facts in this case supported each element required to justify a protective sweep. When the Task Force officers knocked on Mr. Hauk's door, they knew that (1) Mr. Hauk violated parole on a narcotics trafficking conviction; (2) an anonymous informant claimed that Mr. Hauk was selling drugs out of his house, that he had a runner named Spencer, and that he had guns in the house; (3) an unidentified individual had recently parked in the

21

driveway and might have entered the house, and (4) Mr. Hauk attempted to slam the door on the officers.

Police are predisposed by their instinct for self-preservation to assume that an unknown situation is dangerous. The Fourth Amendment limits officers' ability to act on this assumption, but we must take care not to restrict officers' common-sense precautions, particularly in cases involving reasonable suspicion. As the Supreme Court has frankly stated,

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are common-sense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . They are . . . fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.

*Ornelas*, 517 U.S. at 695 (internal citations omitted). Reasonable suspicion requires a showing "considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123. On the facts of this case, a reasonable officer would take precautions to make sure that no hidden threat was lurking in the house.

Mr. Hauk argues that the officers should have conducted a more thorough investigation to corroborate the tip before they arrested him. The officers might, for example, have waited to see whether Mr. Hauk had a stream of short-term visitors consistent with a retail drug operation. But the principle behind this argument would require officers to delay service of a valid arrest warrant

22

whenever circumstances suggest that a protective sweep might be necessary. Efforts to enforce the Fourth Amendment through deterrence of unreasonable police behavior should be tailored not to interfere with the proper execution of police functions. *See United States v. Calandra*, 414 U.S. 338, 347 (1974); *Johnson*, 364 F.3d at 1190 (citing cases). Restricting officers from executing a valid arrest warrant on the possibility that they might discover evidence in the house would deter reasonable police behavior.

We thus conclude that the facts known to the Task Force officers created a reasonable suspicion that a dangerous third party was inside Mr. Hauk's house at the time of the arrest. The measures taken in this case were therefore reasonable, and the district court properly denied Mr. Hauk's motion to suppress.

## III.

Mr. Hauk filed a supplemental brief arguing that his sentence was invalid under *Blakely v. Washington*, 124 S.Ct. 2531 (2004). Considering his argument in light of *United States v. Booker*, 125 S. Ct. 738 (2005), we vacate Mr. Hauk's sentence and remand to the district court for resentencing.

*Booker* extended the Sixth Amendment holding of *Blakely*, concluding that in the context of the mandatory federal Sentencing Guidelines, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict

23

must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. To remedy this constitutional infirmity, the Court severed two provisions of the Sentencing Reform Act of 1986: 18 U.S.C. § 3553(b)(1), which required courts to impose a sentence within the applicable Guidelines range; and 18 U.S.C. § 3742(e), which established standards of appellate review, including de novo review of departures from the Guidelines range. *See Booker*, 125 S. Ct. at 764. *Booker* makes the Guidelines effectively advisory. Courts must consider the Guidelines in addition to other sentencing factors, *see* 18 U.S.C. § 3553(a), but they are not required to impose a sentence within the applicable Guidelines range, and sentences will be reviewed for reasonableness. *See Booker*, 125 S. Ct. at 765–66.

Mr. Hauk pleaded guilty to count two of the indictment, which charged possession with intent to distribute 768.6 grams of cocaine. At his sentencing hearing, the government argued that Mr. Hauk was responsible for crack cocaine and a firearm discovered in the bedroom occupied by Spencer Starns (the "Spencer" who played a role in the preceding section of this opinion). Mr. Hauk contested the government's evidence at sentencing, arguing that the drugs and firearm found in Mr. Starns's room should not be attributed to him. The district court overruled Mr. Hauk's objections after an evidentiary hearing, concluding that the crack cocaine was attributable to Mr. Hauk under a theory of jointly

24

undertaken criminal activity. *See United States v. Mendez-Zamora*, 296 F.3d 1013, 1020 (10th Cir. 2002). With respect to the firearm, the court recognized that Mr. Hauk did not directly possess the gun, but it determined that the offense conduct still satisfied the requirements of U.S.S.G. § 2D1.1(b)(1). To reach this conclusion, the district court found that Mr. Hauk could not show that a connection between the drugs and the weapon was clearly improbable. *See id.* Application Note 3; *United States v. Humphrey*, 208 F.3d 1190, 1210-11 (10th Cir. 2000) (explaining the application of U.S.S.G. § 2D1.1(b)(1)).

The district court determined Mr. Hauk's base offense with reference to all of the drugs discovered in his house. *See* U.S.S.G. § 2D1.1, Application Note 12 ("Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level."). The total quantity of drugs, including those discovered in Mr. Starns's room, resulted in a base offense level of 30. *See id.* § 2D1.1(b)(5). The firearm in Mr. Starns's room increased the base offense by two levels, to 32. *See id.* § 2D1.1(b)(1). The district court reduced the adjusted offense level by three points for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a), (b), resulting in a total offense level of 29, which indicated a sentencing range of 140 to 175 months imprisonment. The court sentenced Mr. Hauk to 140 months imprisonment, the minimum sentence in that range. Based solely on the drug quantities admitted by the defendant, and without

25

an adjustment for acceptance of responsibility, Mr. Hauk's base offense level would have been 26, *see id.* § 2D1.1(c)(7), and his sentencing range would have been 110 to 137 months. *See id.* § 5A. Based on the admitted quantities, and giving Mr. Hauk credit for acceptance of responsibility, the offense level would be 23, and the sentencing range would be 84 to 105 months. *See* U.S.S.G. § 3E1.1(a), (b); *id.* ch. 5, pt. A. Either way, Mr. Hauk's sentence was in excess of the sentencing range based on the admitted facts.

Because Mr. Hauk did not raise his *Blakely* challenge in the district court, we review for plain error. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc). To show plain error, Mr. Hauk must establish three elements: (1) the district court committed error; (2) the error was plain or obvious; and (3) the error affected his substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002). If these conditions are met, the Court may exercise its discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 631–32. We conduct plain-error analysis "less rigidly when reviewing a potential constitutional error." *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005) (quoting *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001)).

It is now well established that constitutional *Booker* error satisfies the first two criteria for plain error review. We turn, then, to the third and fourth.

26

## A. Substantial Rights

To violate a defendant's substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. at 725, 734 (1993). The party that failed to raise the issue below bears the burden of establishing prejudice. *Gonzalez-Huerta*, 403 F.3d at 733. The defendant must show "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004); *see also United States v. Magleby*, 241 F.3d 1306, 1317 (10th Cir. 2001) ("[A]n error affects a substantial right when it has a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect.") (quotation marks omitted).

In a case involving constitutional *Booker* error, a defendant can show an effect on his substantial rights in at least two ways. First, the defendant may be able to demonstrate "a reasonable probability that a jury applying a reasonable doubt standard would not have found the same facts that the judge found by a preponderance of the evidence." *See Dazey*, 403 F.3d at 1175. Appellate courts should therefore review the district court's factual analysis at sentencing and determine whether the evidence presented by the defendant could call the district court's conclusions into reasonable doubt. *See id.* Second, a defendant may be able to show a reasonable probability that consideration of the sentencing factors

27

in § 3553(a) would have led the district court to impose a sentence outside the applicable Guidelines range. *See, e.g.*, *United States v. Trujillo-Terrazas*, ___ F.3d ___, 2005 WL 880896 *4 (10th Cir. April 13, 2005).[2]

The Guidelines require sentencing courts to consider "relevant conduct" at sentencing, *see* U.S.S.G. § 1B1.3, including uncharged drug quantities "if they are part of the same conduct for which the defendant was convicted." *United States v. Mendez-Zamora*, 296 F.3d at 1020 (quoting *United States v. Washington*, 11 F.3d 1510, 1516 (10th Cir. 1993)). After considering the evidence submitted at sentencing, the district court found, by a preponderance of the evidence, that Mr. Hauk and Mr. Starns jointly sold illegal drugs and that the presence of crack cocaine in Mr. Starns's room was reasonably foreseeable to Mr. Hauk. Accordingly, the district court attributed the crack cocaine and the firearm to Mr. Hauk for sentencing purposes. *See id.* 296 F.3d at 1020 ("Relevant conduct includes reasonably foreseeable acts of co-conspirators in furtherance of their conspiracy.") (citing U.S.S.G. § 1B1.3(a)(1)(B)). The finding of a joint criminal enterprise was important to both of these enhancements: without this finding there

---

[2] The circumstances may also indicate that a lower sentence is particularly unlikely, for example, when the court imposes a sentence at the top of the Guidelines range. *Cf. United States v. Riccardi*, ___ F.3d ___, 2005 WL 896430 at *20 (10th Cir. April 19, 2005) (finding a constitutional *Booker* error to be harmless because the court's factual findings were supported by overwhelming evidence and the court sentenced at the top of the Guidelines range).

28

would be no support for the drug quantity enhancement, and the firearm enhancement would be questionable.[3]

The district court relied on two pieces of evidence to support the finding of jointly undertaken criminal activity: the anonymous tip and Mr. Hauk's testimony that there was, according to the court, a "business relationship" between Mr. Hauk and Mr. Starns. R. Vol. IV 50. This evidence is sufficiently equivocal that there is a reasonable probability that a jury using a reasonable doubt standard would find that Mr. Hauk's possession of cocaine was not part of a joint criminal enterprise with Mr. Starns. The anonymous tip contained some information that turned out to be generally correct, such as the presence of powder cocaine, crack cocaine, and marijuana in the house and the lack of any dogs, but some of the specific information in the tip, such as the allegation that Mr. Hauk stored drugs in the ceiling, was not corroborated. The only elements of the tip suggesting joint criminal activity were the tipster's statement that Mr. Hauk sold crack cocaine and his statement that Mr. Starns was a "runner" for Mr. Hauk. While corroboration of some information in the tip may be sufficient to conclude, under a preponderance of the evidence standard, that Mr. Starns and Mr. Hauk jointly operated an illegal

---

[3] It is unclear whether the district court believed the firearm was attributable to Mr. Hauk solely because of the crack cocaine found in Mr. Starns's room or if the district court believed that the firearm was independently attributable to Mr. Hauk based on its presence in his home.

29

drug enterprise, we question whether a jury would come to the same conclusion using the more onerous reasonable doubt standard.

Mr. Hauk's testimony also provides an uncertain basis for the finding of joint drug sales activity. For example, Agent Volanti testified that Mr. Hauk told him that "he had to go through his friend Spence" and that he "would use Spence . . . as the middle man." R. Vol. IV 14–15. This vague reference is the only suggestion that Mr. Starns acted as a middle man at or near the time of the arrest. In the full context of the interview, however, it appears that Mr. Hauk could have been describing his introduction to suppliers through Mr. Starns in the past rather than a continuing pattern of activity. Mr. Hauk acknowledged that Mr. Starns had introduced him to suppliers in the past, but he testified that the most recent introduction occurred approximately a year before the arrest. While this admission may make it more likely than not that Mr. Starns played a joint role in "the commission of the offense of conviction," U.S.S.G. § 1B1.3(a)(1), the connection between this admission and the district court's conclusion is sufficiently distant in time that a fact-finder applying a reasonable doubt standard might not make the same determination. *Cf. United States v. Mozee*, ___ F.3d ___, 2005 WL 958498 at *8 (10th Cir. April 27, 2005) (concluding that the evidence was sufficient to satisfy a preponderance standard, but there was a reasonable probability that a jury would not come to the same conclusion under a reasonable doubt standard).

30

Moreover, the district court did not discuss several pieces of evidence that undermine the conclusion that he and Mr. Starns were selling illegal drugs together. For example, there is evidence that the door to Mr. Starns's room was locked, an assertion which, if true, would support the theory that his and Mr. Starns's dealings were independent. During his testimony, Mr. Hauk discussed a photograph of the arrest scene and indicated that the police broke down the door to Mr. Starns's room, which supports his claim the door was locked. In addition, Mr. Hauk testified that Mr. Starns had been staying with him for only three weeks to a month at the time of his arrest. He admitted that he and Mr. Starns knew many of the same suppliers, but he insisted they did not purchase large quantities of drugs together and Mr. Starns did not bring people to his house to buy drugs.

Perhaps most significantly, while readily admitting to possession of all other drugs in the house, Mr. Hauk consistently denied any connection to crack cocaine, which was the substance found in the suitcase in Mr. Starns's room. Agent Volanti testified that on the day of the arrest, he mistook some of the cocaine that was plainly visible in Mr. Hauk's house for crack. When he mentioned to Mr. Hauk that there was a lot of crack in the house, Mr. Hauk told him that it was only cocaine and that he did not sell crack. R. Vol. IV 11. In a post-arrest interview with Agent Volanti, Mr. Hauk again denied selling crack cocaine. *Id.* at 18–19. The government suggests that the crack cocaine belonged to Mr. Hauk because the

suitcase in Mr. Starns's room was very similar to a suitcase containing marijuana that was found in his own room. The record does not indicate how similar the suitcases were, but without some specific reason to believe that they were anything more than two ordinary black suitcases, it is difficult to see how the resemblance supports the inference.

Using the "less rigid" approach required in analysis of constitutional plain errors, the cumulative effect of this conflicting evidence leads us to conclude that there is a reasonable probability that a fact-finder using a reasonable doubt standard would not reach the same conclusion as the district court. Accordingly, we hold that the district court's Sixth Amendment error affected Mr. Hauk's substantial rights.

## B. The Integrity, Fairness, or Public Reputation of Judicial Proceedings

An appellate court has discretion to correct an error not preserved at trial when the error affects the integrity, fairness, or public reputation of judicial proceedings. *Gonzalez-Huerta*, 403 F.3d at 736. This inquiry is independent from our analysis of whether a plain error affects a defendant's substantial rights. *Id.* The burden to satisfy this fourth prong of plain error analysis is on the defendant. *See Olano*, 507 U.S. at 734. This Court has identified three "non-exclusive" factors that guide the exercise of this discretion to correct constitutional *Booker* errors that are plain. *United States v. Clifton*, ___ F.3d ___, 2005 WL 941581 at

32

*6 (10th Cir. April 25, 2005). First, if the underlying right is constitutional, we are more likely to conclude that a remand would be appropriate. *See Dazey*, 403 F.3d at 1178; *see also Gonzalez-Huerta*, 403 F.3d at 743 (Ebel, J., concurring in part, dissenting in part) (arguing that failing to correct a constitutional plain error is "much more likely to cast judicial proceedings in disrespect"). Second, if the defendant challenged the factual basis of the judicial findings that affected his substantial rights, this weighs in favor of a remand. *Dazey*, 403 F.3d at 1178. Third, the magnitude of the difference between the sentence authorized by a jury's verdict or a plea of guilty and the sentence permitted after mandatory judicial fact finding affects whether or not we should correct the error. *Id.* at 1178-79.

All three of these factors suggest that a remand would be appropriate in Mr. Hauk's case. First, the error in his sentence is the type of constitutional error identified by the *Booker* merits majority as a violation of a defendant's Sixth Amendment rights. To leave an erroneous sentence intact after acknowledging that it was calculated through constitutionally suspect means could reflect poorly on the public reputation of the judiciary. Second, Mr. Hauk vigorously contested the factual basis of the enhancements that increased his sentence. *Cf. United States v. Maldonado-Ramires*, 384 F.3d 1228, 1231 n.1 (10th Cir. 2004) (holding that a *Blakely* violation is not plain error when the defendant did not dispute the court's factual findings, even if the court had discretion to reduce the sentence).

33

Where a defendant acquiesces to the district court's findings of fact that support an enhancement with little or no objection, leaving the resulting plain error uncorrected poses little risk to the fairness or integrity of judicial proceedings. *United States v. Magallanez*, No. 04-8021 (10th Cir. May 17, 2005). However, when a defendant vigorously contests a factual finding that leads to a mandatory enhancement there is a much stronger argument for exercising our discretion to correct the error. Mr. Hauk's emphatic argument, that the offense to which he pleaded guilty was not part of a joint criminal enterprise with Mr. Starns, weighs in favor of remand.

Finally, we consider whether the mandatory application of judge-found facts substantially increased Mr. Hauk's sentence. This depends, in part, on whether we give Mr. Hauk credit for acceptance of responsibility, as the district court did. This Circuit has not decided whether adjustment for acceptance of responsibility is deemed to be judicial fact-finding for purposes of *Booker*; however, the outcome of Mr. Hauk's case does not depend on the answer to that question. With or without credit for acceptance of responsibility, the judge-found facts violated Mr. Hauk's Sixth Amendment rights, and they exposed him to a substantial increase in punishment.

The effect of the judge-found facts was to increase the bottom of the applicable sentencing range by either 30 or 56 months, depending on whether Mr.

Hauk is credited with acceptance of responsibility. While these increases are not as large as the ten years the Supreme Court called "very serious"in *Booker*, 125 S.Ct. at 751, this is a substantial amount of prison time. *Cf. Dazey*, 403 F.3d at 1179 (calling a 20-level enhancement based on judicial fact finding "sizable"). Moreover, the district court sentenced Mr. Hauk at the bottom of the Guidelines range, which suggests that had the district court fully considered the tenuous nature of the evidence supporting the enhancements, Mr. Hauk might not have received these two and a half to almost five additional years of incarceration. *Cf. United States v. Lawrence*, ___ F.3d ___, 2005 WL 906582 at *13 (10th Cir. April 20, 2005) (citing the district court's imposition of a sentence two months above the bottom of the Guidelines range as evidence that constitutional *Booker* error had no effect on the defendant's sentence). We therefore conclude that failing to correct the plain error in Mr. Hauk's sentence would affect the integrity, fairness, or public reputation of judicial proceedings, and we exercise our discretion to remand his case for resentencing.

In doing so, we do not mean to suggest that the district court ought to reach a different conclusion on remand, but only that, in light of *Booker*, it should have the opportunity to resentence Mr. Hauk under the new, non-mandatory Guidelines regime.

## V.

For the reasons stated above, we conclude that the arresting officers had reasonable suspicion sufficient to justify the protective sweep. The district court's denial of Mr. Hauk's motion to suppress is therefore AFFIRMED. Reviewing Mr. Hauk's claim of constitutional sentencing error under Rule 52(b), we VACATE the sentence and REMAND for further proceedings consistent with this opinion.

No. 04-3113, *United States v. Hauk*

**MURPHY**, Circuit Judge, concurring in the judgment.


I concur in the judgment but write separately to express my dissent to the approach taken by the majority in Part IIA. Like the majority, I question the constitutionality of the alleged policy of the Kansas City Police Department to conduct a sweep of every residence when executing an arrest warrant. That issue, however, is not before this court because Hauk does not raise it on appeal. Neither does Hauk argue that the officers' professional judgment should be accorded something less than "due weight" because they acted pursuant to the alleged policy when they conducted the sweep. Although the majority purports to resolve both of these legal questions, it does so by engaging in fact-finding. Ultimately, however, the majority resolves this case without applying the rules it adopts, rendering the entire discussion of the issue dicta.

During the hearing on Mr. Hauk's suppression motion, Detective Shomin testified that it was the policy of the Kansas City Police Department to routinely conduct a protective sweep when executing an arrest warrant. When the district court ruled on the motion, however, it clearly and repeatedly stated that its ruling was not based on the alleged policy,

> [T]here [were] statements made to the court in regards to the evidence specifically as they related to Detective Shomin's testimony in regards to whether or not there is some type of official or unofficial pattern or practice of the Kansas City, Kansas Police Department when they

execute their arrest warrant. I would tell you, Mr. Hauk and Mr. Harris, that is not the issue before the court in this case . . . . So, the issue about this pattern and practice, this blanket exception is not before the court. The court is not going to rule one way or the other in regards to that pattern or practice legality.

Consistent with these statements, the court resolved the motion by concluding that the facts presented, together with the reasonable inferences that could be drawn from those facts, provided justification for the protective sweep. Accordingly, the court made *no* finding that a policy or practice exists, let alone a finding that the officers acted pursuant to any such policy.

Hauk focuses his appellate argument on his position that no specific, articulable facts existed to support the protective sweep. The bulk of his argument is directed toward challenging the officers' reliance on the information contained in the anonymous tip which he asserts contains no predictive information that could be corroborated. As the majority points out, he also includes one sentence in his appellate brief, arguing that the sweep was therefore improper because it was based solely on "'generalizations by [the officers] about drug offenders, their use of weapons, and their use of other people.'" Majority Opinion at 6-7 (quoting Appellant's Br. at 13-14). He does *not* argue or provide any support for the position that the alleged policy is unconstitutional or that the professional judgment of the officers is not entitled to "due weight" because the sweep was conducted pursuant to the alleged policy. *See Phillips v. Calhoun*, 956 F.2d 949,

953-54 (10th Cir. 1992) (holding that an appellate argument must be supported by legal argument and authority). He, instead, makes the broader argument that the evidence obtained from the search should be suppressed because "the search was based on the unparticularized suspicion and hunch that because the warrant was for a parole violation for a narcotics offense, someone else might be present in the house." Appellant Br. at 13.

In resolving this appeal the majority first addresses the propriety of the alleged "practice" testified to by Detective Shomin. Recognizing that the government did not base its argument on the alleged policy, the majority concludes that "[i]f the government were relying on the validity of the Kansas City policy to support this protective sweep, or *if* the subjective motivations of the officers in undertaking the sweep were controlling, we would thus have to reverse this conviction." Majority Opinion at 9 (emphasis added). It then proceeds to *find* both that a policy or practice actually exists and that "there is every reason to believe that the police engaged in the sweep of Mr. Hauk's residence not because they believed they had reasonable suspicion of danger, but because they were executing 'general policy' of conducting protective sweeps in the course of all arrests within a home." *Id*. This appellate fact-finding is wholly inappropriate and contrasts sharply with the approach taken by the district court which declined to make any factual findings with respect to the alleged practice. Armed with these

findings, the majority then embarks on an analysis of the weight to be given the officers' professional experience and judgment in light of their reliance on the alleged policy. Although the majority concludes that the officers' judgment is not entitled to "due weight," it fails to articulate exactly the weight it should be given. But this omission is of no consequence, since the majority then resolves the issue before this court without applying the new rule it needlessly crafts.

Because I agree with the majority's ultimate conclusion, reached without any reliance on the dicta, that "the facts in this case supported each element required to justify a protective sweep," I concur in the judgment.