**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 31, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

v.

DAVID LERONE COPENING, a/k/a
Devonta Carpenter, a/k/a David D.
Copening, a/k/a Michael D. Copening,

Defendant/Appellant.

No. 06-5232

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 06-CR-92-HE)**

---

Robert A. Ridenour, Assistant Federal Public Defender (John V. Butcher, Federal Public Defender, and Barry L. Derryberry, Research & Writing Specialist, Office of the Federal Public Defender, with him on the brief), Tulsa, Oklahoma.

Leena Alam, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with her on the brief), Tulsa, Oklahoma.

---

Before **LUCERO, BALDOCK,** and **GORSUCH**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Based on a series of calls to 911 from an anonymous tipster, a Tulsa, Oklahoma police officer initiated an investigatory stop of a truck in which Defendant David Lerone

Copening was a passenger. Thereafter, police detained Defendant via a "felony takedown." A grand jury indicted Defendant with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Following the district court's denial of his motion to suppress, Defendant entered a conditional guilty plea. See Fed. R. Crim. P. 11(a)(2). On appeal, Defendant challenges the underlying stop and detention under the two-prong analysis set forth in Terry v. Ohio, 392 U.S. 1 (1968). We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

I.

We derive the following undisputed facts from Tulsa Police Department Dispatch ("911 dispatch") transcripts, as well as the suppression hearing transcript. On April 8, 2006, 911 dispatch received a series of calls from phone number 378-2000. The first call came in at 9:30 p.m. An anonymous male caller reported that he "just saw" a bald, African-American man, later identified as Defendant: (1) exit a vehicle – "tag VKQ833" – at the QuikTrip at "31st and 129th" streets; (2) drop a pistol outside the convenience store; (3) pick up the pistol; (4) return to the vehicle; (5) "stash" the pistol in the vehicle's seat; and (6) enter the QuikTrip.[1] The caller described the vehicle as a 1500 Chevy, extended-cab, short-bed truck, "probably a 95 model," that was "silver/goldish" in color

---

[1] Oklahoma law allows an individual to openly transport an unloaded pistol in a motor vehicle. 21 Okla. Stat. § 1289.7. "'[O]pen' means the firearm is transported in plain view, in a case designed for carrying firearms, which case is wholly or partially visible, in a gun rack mounted in the vehicle, in an exterior locked compartment or a trunk of a vehicle." Id.

and had "silver chrome bars on top of the bed." The caller declined to identify himself. After the dispatcher stated "someone" would "check it out," the call ended.

Dispatch received a second call from 378-2000, again from an anonymous male caller, who stated he had just called regarding a truck – tag VKQ833 – at the "31st and 129th" QuikTrip. The caller provided additional information about the QuikTrip incident, stating: (1) the man exited the truck; (2) a "gun fell out of his pants" as he approached the convenience store's entrance; (3) the man "picked up the gun [and] stuck it in his pants;" (4) he walked back to the vehicle and "stuck it underneath the seat;" and (5) the man then entered the QuikTrip. Again, the male caller declined to identify himself. The caller stated he was calling a second time to report that the "two black men" in the truck were leaving the QuikTrip. Before the connection dropped, the caller told dispatch he was following behind the vehicle, heading west on 31st Street.

Shortly thereafter, dispatch received a third call from 378-2000. The male caller referenced having "just called in twice" about a pickup with tag VKQ833. The caller again stated he: (1) was following the truck westbound on 31st Street; and (2) had just seen "a policeman go eastbound." The caller continued to update dispatch on the caller's location: (1) "we're about 30 yards behind them," headed westbound on 31st Street "toward 169;" (2) "they're still headed" west on 31st, "towards Mingo;" (3) they "[j]ust went underneath 169;" (4) "[t]hey're picking up their speed;" (5) "they're almost to Mingo right now;" (6) "[they're about] 3/4 mile from Memorial;" and (7) they turned north. The connection dropped and the call ended. When 911 dispatch called 378-2000,

3

a voice-mail recording for "Ashley" played.

During the fourth call from 378-2000, the anonymous caller noted he was the person who had "reported a pickup," with license plate VKQ833, "at 31st and 129th." The caller updated the 911 dispatcher on the truck's location: (1) "right now we're [behind the truck] at 11th Street going northbound on Memorial;" (2) the truck turned right on 21st Street and was "going east . . . . from Memorial;" (3) we are "about 200 yards" behind the truck; and (4) we just passed "under I-44" and are going "through 101st." The caller told dispatch a police cruiser "turned around behind [the caller's vehicle]." At the dispatcher's request, the caller noted businesses and landmarks along the route. The connection dropped. The 911 dispatch called 378-2000 and, again, the same voice-mail recording for "Ashley" played.

The final communication transpired when 911 dispatch placed another call to 378-2000. A female voice answered. When the dispatcher asked "[a]re you the guy who's following that truck," a male voice could be heard saying "[t]he police got him." The female voice then stated that "six police officers were running that way" and had "got[ten] a hold of him." The call ended.

At the suppression hearing, Tulsa Police Officer Daniel Bean testified he was on patrol in the vicinity of 31st and 129th when he heard dispatch relay the anonymous caller's 9:30 p.m. tip. Accordingly, the officer was aware the caller had reported that one of the two men: (1) dropped a gun on the ground outside the 31st and 129th QuikTrip; (2) picked up the gun; and (3) stuck the gun under a seat in the vehicle. Further, the officer

4

was aware the suspects were driving a silver Chevy extended-cab truck with a specified tag number. After receiving this information, Officer Bean proceeded to the 31st and 129th QuikTrip. When he arrived at that location, however, no vehicle matched the caller's description. Dispatch, in turn, informed Officer Bean that the caller was: (1) still speaking to dispatch; and (2) following the truck, west on 31st Street. The officer turned west on 31st street. Dispatch relayed that – according to the caller – the truck had: (1) traveled "west on 31st through Mingo;" (2) "turned northbound on Memorial from 31st;" and, later (3) turned "east on 21st Street from Memorial Road." Officer Bean testified he first encountered the truck at 21st and 104th streets (*i.e.*, where other officers had stopped the truck). Officer Bean testified this location was consistent with the truck's direction of travel as reported by the anonymous caller.

Meanwhile, Tulsa Police Officer Josh Dupler had also heard the 9:30 p.m. dispatch call. At that time, Officer Dupler was on patrol, headed south near the 10100 block of 21st Street. The officer testified he was aware, via dispatch, that the caller: (1) reported the individual in question "had the gun in their possession;" (2) "was following the vehicle" and "kept giving updates [to dispatch regarding] where the vehicle was;" and (3) had described the vehicle in question as a "silver Chevy . . . Extended Cab pickup truck" and provided its tag number. Officer Dupler testified that dispatch did not inform him, and he was not otherwise aware, that the call was anonymous.

When dispatch updated the truck's location as being "eastbound on 21st Street [in the] 9500 block area," Officer Dupler realized he was quite close to that location. Officer

5

Dupler testified he believed dispatch was relaying information received from the caller. When the officer reached the 9700 block of 21st Street he "saw a vehicle that matched [the] description [relayed by dispatch]." He updated dispatch accordingly. Dispatch replied that the caller had "just passed an officer." Officer Dupler, due to his location, assumed the caller had seen his cruiser. The officer turned around, heading east on 21st street, and approached the vehicle ahead of him.

Officer Dupler testified that, after following the truck for approximately three blocks, he confirmed the vehicle's description and tag number matched the tag number relayed by dispatch. At that point, the officer decided to stop the vehicle. Once two other officers arrived, Officer Dupler activated his cruiser's safety lights. The truck responded by turning into a parking lot. The three police cruisers turned into the parking lot, near 10400 21st Street, and stopped their vehicles approximately thirty-five to forty feet behind the truck, parallel to one another.

The officers proceeded to detain the truck's two occupants via a "felony takedown." Officer Dupler explained that he employed this standard procedure because, at the time he stopped the vehicle, he believed the occupants had a loaded gun. Officer Dupler described the felony takedown procedure as follows: the officers (1) exit their cruisers, staying behind their driver's-side door, with their guns drawn; (2) obtain a view of the occupants' hands; (3) direct the driver to throw the vehicle's keys on the ground, using only their left hand; (4) order the occupants to exit the vehicle, one at a time, with their hands above their head; (5) tell the suspects to back up, *i.e.*, facing away from the

6

officers, toward the police cruisers; and (6) handcuff the suspects, either standing, kneeling, or in a prone position, from behind. Throughout the takedown officers keep guns fixed on both the vehicle and the suspects.

In this case, at least six officers participated in the felony takedown. Police handcuffed Defendant and the driver standing. The officers recovered a loaded gun from the truck's back seat and the underlying prosecution ensued. The district court made factual findings consistent with this summary of events.

## II.

Defendant challenges the district court's denial of his suppression motion, arguing the officers' stop of the truck and subsequent detention of his person violated his Fourth Amendment rights. Specifically, Defendant contends: (1) the police impermissibly stopped the truck based on an anonymous tip; and (2) officers used excessive force in detaining him.[2] Both arguments present questions of law that we review de novo. United States v. Samuels, 493 F.3d 1187, 1191 (10th Cir. 2007); see also United States v. Moran, No. 06-2175, 2007 WL 2775083, at *2 (10th Cir. Sept. 25, 2007). For Fourth

---

[2] Defendant also argues the district court's finding that the QuikTrip is located in a "high-crime area" was clearly erroneous. Our review of the record reveals that, despite Officer Dupler's testimony that portions of the area did not have "any problems" with crime, the Government introduced sufficient evidence at the suppression hearing to support the district court's finding. United States v. Romero, No. 06-3092, 2007 WL 2694242, at *3 (10th Cir. Sept. 11, 2007) ("A finding is clearly erroneous when it is without factual support in the record or we are left with the definite and firm conviction that a mistake has been made."). In any event, a contrary conclusion would not alter the ultimate conclusion we reach here, *i.e.*, that the stop and detention did not contravene the Fourth Amendment.

7

Amendment purposes, traffic stops are analogous to investigatory detentions; their lawfulness is governed by Terry and its progeny. See United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006). Under Terry, we assess investigatory detentions' reasonableness by asking: (1) "whether the officer's action was justified at its inception;" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

A.

We first address Defendant's claim, under Terry's first prong, that the officers lacked reasonable suspicion to initiate the investigatory stop. Defendant argues that, however elaborate, the 911 calls – the only basis for the stop – constituted nothing more than an uncorroborated anonymous tip. Defendant contends the caller's efforts are wholly consistent with those of a nefarious informant, bent on bolstering the effectiveness of his fabricated claims. As such, Defendant contends the 911 calls are analogous to those found unreliable in Florida v. J.L., 529 U.S. 266 (2000).[3]

Under Terry's strictures, the police may initiate a traffic stop if they have reasonable suspicion that criminal activity "is, has, or is about to occur." Samuels,

---

[3] In J.L., the Supreme Court considered whether an anonymous, unrecorded caller's tip – that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" – was, without more, sufficiently reliable to lawfully initiate a Terry stop. J.L., 529 U.S. at 268, 270. The Court held that it was not. Id. at 271. The J.L. Court reasoned the tip lacked the requisite reliability because, inter alia, it: (1) "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility;" and (2) did not explain "how [the caller] knew about the gun nor supplied any basis for believing he had inside information on J.L." Id.

493 F.3d at 1191 (internal quotations omitted); see also Illinois v. Wardlow, 528 U.S. 119, 123 (2000); Terry, 392 U.S. at 30. Here, the officers' belief that Defendant possessed a gun stemmed exclusively from an unknown caller in an unknown location, rather than their own observations. See J.L., 529 U.S. at 270. Anonymous tips raise difficult Fourth Amendment questions. In contrast to information obtained from a known informant, an anonymous tip rarely allows authorities to assess the informant's veracity, reliability, or basis of knowledge. Id.; see also United States v. Johnson, 364 F.3d 1185, 1190-91 (10th Cir. 2004) (stating that an informant's desire to safeguard anonymity raises questions about the individual's motives, *e.g.*, whether they are "trying to use the police to harass another citizen"). Nevertheless, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." J.L., 529 U.S. at 270. Indeed, we have recognized that "[a] confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion . . . ." Samuels, 493 F.3d at 1191 (internal quotations omitted).

We are convinced the five calls placed to 911 dispatch possessed the requisite "indicia of reliability" to justify officers' stop of the truck in which Defendant was riding on a suspected weapons violation. Contrary to Defendant's position, the tip at issue in this case is readily distinguishable from the anonymous, unrecorded, and uncorroborated tip deemed unreliable in J.L. See J.L., 529 U.S. at 270. Multiple facts,

9

known to Officer Dupler when he initiated the stop, bolstered the tip's reliability. See United States v. Brown, 496 F.3d 1070, 1075 (10th Cir. 2007) (noting that "'[a]ll the police had to go on [in J.L.] . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.'" (quoting J.L., 529 U.S. at 271) (additional internal quotations omitted)).

First, though the caller declined to provide his name, he called 911 from an unblocked telephone number. The caller should have expected that 911 dispatch tracks incoming calls and that the originating phone number could be used to investigate the caller's identity. Cf. Johnson, 364 F.3d at 1191 (finding J.L.'s concerns partially mitigated by the fact that the anonymous caller "g[a]ve police his cell phone number"). The fact the caller provided authorities some basis for discovering his identity makes it is less likely his tip was phony. See United States v. Jenkins, 313 F.3d 549, 554 (10th Cir. 2002) (reasoning that jeopardizing one's anonymity creates "disincentive for making false allegations"). Second, the caller told dispatch he saw the QuikTrip weapons incident, *i.e.*, he "claimed firsthand knowledge of the alleged conduct." Brown, 496 F.3d at 1076. Third, the caller's detailed description of the QuikTrip events and the individuals involved, as well as their vehicle and its tag number, further bolstered the tip's reliability. Jenkins, 313 F.3d at 554-55. Though the caller described the QuikTrip incident in slightly different terms each time he phoned dispatch, his accounts did not differ materially. Id. Fourth, taken together, the caller's unusual

10

efforts in reporting the QuikTrip events to 911 dispatch, detailing what he observed, following the vehicle, and updating dispatch regarding the truck's location, bespeak an ordinary citizen acting in good faith. Indeed, the 911 transcripts provide no indication that the caller had iniquitous intentions. For instance, during the third call, the anonymous individual stated: "I just, just hate to see that kind of stuff going on, you know? I mean there's a lot of things I can tolerate; but I can't tolerate dudes running around with guns . . . in QuikTrips, . . . you know what I mean?"

Fifth, Officer Dupler corroborated the caller's real-time account of the truck's travel route *before* he initiated the stop. See Brown, 496 F.3d at 1076 ("the officers knew that the caller's information was based on firsthand knowledge and that it was contemporaneous"). That is, by verifying the caller's account of the truck's constantly-changing location, the officer "test[ed] the informant's knowledge and credibility." See United States v. Hauk, 412 F.3d 1179, 1188 (10th Cir. 2005). As detailed above, the caller claimed knowledge of: (1) the alleged criminal activity; and (2) the truck's position. The officer's corroboration of the latter information, lent credibility to the former. This is particularly true where, as here, the caller's asserted basis of knowledge – as to both types of information – was first-hand and real-time observation. See id.

Accordingly, the detailed nature of the tip "significantly circumscribed the number of people police could have stopped in reliance on it." Johnson, 364 F.3d at 1191; cf. J.L., 529 U.S. at 272 ("An accurate description of a subject's *readily*

11

*observable* location and appearance . . . . does not show that the tipster has knowledge of concealed criminal activity." (emphasis added)). Indeed, we can not imagine the police could have stopped any other vehicle based on these calls. See Johnson, 364 F.3d at 1191 n.3.

Exercising the significant "skepticism and careful scrutiny" required in the anonymous-informant context, see Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985), we conclude that, under the totality of the circumstances, the anonymous caller's tip, relayed by dispatch to the officers, bore "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." J.L., 529 U.S. at 270. We underscore, however, that this outcome is wholly driven by the collective facts at bar and that no single factor dictated this result. Brown, 496 F.2d at 1078-79 (anonymous caller's "story and the surrounding facts possessed an internal coherence that gave weight to the whole").

### B.

Defendant also challenges the district court's denial of his suppression motion under Terry's second prong. Specifically, Defendant argues the officers exceeded the scope of the stop and transformed it into an impermissible arrest when they detained him by "felony takedown." Terry, 392 U.S. at 20. Where police exceed the limits of a Terry stop, the detention "becomes an arrest that must be supported by probable cause." United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002). At the same time, bright-line rules do not govern the permissible scope of an investigative

12

detention. "'[C]ommon sense and ordinary human experience'" trump "'rigid criteria.'" Id. (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)). Because police officers need not take unnecessary risks in the line of duty, they may take precautionary measures that are reasonably necessary to safeguard their personal safety, and to "maintain the status quo," during a Terry stop. United States v. Shareef, 100 F.3d 1491, 1495 (10th Cir. 1996) (internal quotations omitted).

Defendant concedes that a Terry stop is not rendered unlawful, per se, by officers' use of handcuffs and weapons. We have upheld police officers' use of handcuffs and guns during a Terry stop where they "reasonably believe" such measures are necessary to ensure officer safety. See Neff, 300 F.3d at 1220; see also Shareef, 100 F.3d at 1495. Defendant maintains, however, the facts at bar did not justify officers' use of the "felony takedown" procedure because: (1) the stop was based on suspicion of a "technical offense," not a violent crime; (2) the weapon reportedly in the vehicle was not "inherently dangerous;" and (3) nothing indicated that "any violence or threat was afoot." We disagree.

Officer Dupler testified he believed that a loaded gun – by any measure an inherently dangerous weapon – was in the truck's passenger compartment. The vehicle obviously had two occupants. Maryland v. Wilson, 519 U.S. 408, 414 (1997) ("danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car"). The safety risk attendant to detaining the truck's occupants on a suspected weapons violation alone justified the use of

13

handcuffs; the "need to detain multiple defendants made the use of handcuffs all the more reasonable." Cf. Muehler v. Mena, 544 U.S. 93, 100 (2005) (during execution of a lawful search warrant for guns and gang-related evidence, authorities' detention and handcuffing of a premises' occupant, at gun point, did not violate the Fourth Amendment). "[T]he facts available to the officer[s] would warrant a man of reasonable caution" to believe that "the action taken was appropriate." Shareef, 100 F.3d at 1502 (internal quotations omitted). As such, the "felony takedown" procedure, as detailed by Officer Dupler's testimony, was not unnecessarily forceful or intrusive, but rather an appropriate "precautionary measure," under these circumstances. See id. at 1506.

We, therefore, conclude the officers did not use excessive force in detaining Defendant and, thus, did not convert his detention into an unlawful arrest. See United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (pointing gun at suspects during a Terry stop did not elevate a seizure into an arrest given, *inter alia*, that the officers reasonably believed the individuals to be armed and dangerous); United States v. Merritt, 695 F.2d 1263, 1274 (10th Cir. 1982) ("Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt.").

AFFIRMED.