FILED
United States Court of Appeals
Tenth Circuit

October 18, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHRISTOPHER ROY CHAVEZ,

Defendant - Appellant.

No. 10-2273

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 2:09-CR-03086-RB-1)

Thomas L. Wright, Attorney, El Paso, Texas, appearing for Appellant.

Gregory J. Fouratt, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, and Terri J. Abernathy, Assistant United States Attorney, with him on the brief), Office of the United States Attorney for the District of New Mexico, Las Cruces, New Mexico, appearing for Appellee.

Before **GORSUCH, HOLLOWAY,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

On April 11, 2008, Defendant-Appellant Christopher Roy Chavez was arrested

during a traffic stop for driving while intoxicated ("DWI").  After his arrest, the police

impounded the vehicle he was driving.  They subsequently obtained a warrant to search the vehicle for illegal contraband.  During the ensuing search, officers found approximately one-third of a pound of cocaine.

Mr. Chavez was indicted for one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C).  He filed a motion to suppress the cocaine, arguing it was obtained in violation of the Fourth Amendment.  The district court denied the motion.  Mr. Chavez entered a conditional guilty plea.

During his sentencing hearing, the district court concluded Mr. Chavez qualified as a "career offender " under the United States Sentencing Guidelines (the "Sentencing Guidelines" or the "Guidelines") based on a prior conviction for attempted drug trafficking.  Mr. Chavez objected, contending that attempted crimes do not qualify as predicate offenses for determining career offender status. The district court rejected this argument and sentenced Mr. Chavez to 120 months of imprisonment.

Mr. Chavez appeals the denial of his motion to suppress and the district court's conclusion that attempted crimes can be counted towards determining career offender status.  Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm Mr. Chavez's conviction and sentence.

## I.   BACKGROUND

### A. Facts

#### 1.   The Tip

On April 11, 2008, at approximately 2 a.m., a dispatcher at the Alamogordo, New

Mexico Police Department received a 911 call from a Wal-Mart employee (the "caller" or "employee") reporting a disturbance in the store's parking lot. The caller stated that the individuals causing the disturbance were located in or around a white Cadillac and a black pickup truck, and that the driver of the Cadillac was potentially intoxicated. The caller provided the dispatcher with license plate numbers for the Cadillac and black pickup truck. The dispatcher sent Officers David McColley and Kenneth Funk to the parking lot.

## 2. *The Stop*

Approximately three minutes after dispatch received the 911 call, Officer McColley arrived at the parking lot. He saw an individual standing outside of the Wal-Mart's doors, pointing in the direction of a white Cadillac and a black pickup truck.

Officer McColley stopped the Cadillac, exited his vehicle, and approached the Cadillac's driver. He explained to the driver that he had received a report of a disturbance in the parking lot. The driver, Christoper Roy Chavez, denied causing a disturbance and stated that his passenger had been shopping in the Wal-Mart. Officer McColley observed that Mr. Chavez's eyes were bloodshot and watery, and he detected an odor of alcohol emanating from Mr. Chavez. He asked Mr. Chavez if he had been drinking; Mr. Chavez stated he had not.

While Officer McColley was talking to Mr. Chavez, Officer Funk arrived at the parking lot. He was immediately flagged down by the man standing outside of the Wal-Mart. The man identified himself as the employee who placed the 911 call. The employee told Officer Funk that he observed the Cadillac pull into a parking space

immediately adjacent to the black pickup truck. He further stated that he had watched the driver of the truck get into the passenger side of the Cadillac. Finally, he stated that he saw the driver of the Cadillac urinating in the parking lot and that a few minutes later he saw the occupants of the Cadillac throw Taco Bell wrappers and shot-sized liquor bottles into the parking lot. After speaking with the caller, Officer Funk drove his patrol car to where Officer McColley had stopped Mr. Chavez.

### 3. *The Investigation*

As Officer Funk arrived at the scene of the stop, Officer McColley asked Mr. Chavez to step out of the Cadillac and to give him his driver's license and proof of insurance. Mr. Chavez did not have a copy of his driver's license, but provided a New Mexico identification card containing his name. He told Officer McColley that the Cadillac belonged to a friend named David Aguirre. Officer McColley asked why the Cadillac's title stated that it was owned by a man named Manuel Renterria. Mr. Chavez was unable to provide a clear answer.

Officer McColley again asked Mr. Chavez if he had been drinking. This time Mr. Chavez stated he had consumed a couple of beers. Officer McColley conducted three field sobriety tests on Mr. Chavez. Based on his observations during the tests, Officer McColley "was certain that Mr. Chavez was intoxicated." *United States v. Chavez*, No. 09-3086RB, Order Denying Motion to Suppress, at 6 (D. N.M. Nov. 17, 2009) ("Chavez I").

After conferring with Officer Funk, Officer McColley asked Mr. Chavez to identify the passenger in the Cadillac. Mr. Chavez stated that the passenger's name was

-4-

John, but was unable to provide John's exact address. Officer McColley then asked Mr. Chavez if he had any contraband in the Cadillac. Mr. Chavez responded, "[N]o, you can look around." *Id.* As Officer McColley spoke to Mr. Chavez, police dispatchers informed him that Mr. Chavez's driver's license had expired. Upon learning this information, Officer McColley informed Mr. Chavez that he was "very close" and a "half a second" from arresting him. *Id.* at 7. Throughout this encounter, Mr. Chavez appeared agitated and nervous and his speech was slurred.

Approximately twenty minutes after the stop began, Officer McColley asked Mr. Chavez if he would consent to a search of the Cadillac. Mr. Chavez declined, stating he was not the owner of the vehicle and that he did not want to be responsible for it. Officer McColley informed Mr. Chavez that he could consent to a search of the vehicle because he was driving it. Mr. Chavez responded that the officers had already searched the vehicle with their flashlights. Officer McColley asked Mr. Chavez if he needed to call a dog to conduct a search. Mr. Chavez responded, "[I]f that's what they needed to do." *Id.* at 8. At that point, Mr. Chavez appeared nervous and accused the officers of harassing him. Officer McColley again warned Mr. Chavez that he was very close to getting arrested for DWI.

Twenty-seven minutes after initiating the stop, Officer McColley radioed dispatch and requested that a drug-sniffing canine be sent to the scene. Officer McColley informed Mr. Chavez that he had initially stopped him because he was drinking and that he had called a drug dog because he suspected there might be "more" in the Cadillac. *Id.* at 9. Mr. Chavez stated that he was not worried because the Cadillac was not his vehicle.

While he waited for the canine to arrive, Officer McColley continued questioning Mr. Chavez about the ownership of the vehicle and his whereabouts before the stop.

### 4. *The Searches and Arrest*

Approximately fifty minutes after Officer McColley stopped Mr. Chavez, a drug-sniffing canine arrived at the parking lot. The dog did not detect any odors of illegal contraband outside of the Cadillac. An officer asked Mr. Chavez if the dog could search the passenger compartment of the vehicle. Mr. Chavez stated that "it was okay to run the dog inside the vehicle." *Id.* at 11. While inside the passenger compartment, the dog alerted to a seam in the backseat. The officers showed Mr. Chavez the location where the dog had alerted and asked him for permission to search it. Mr. Chavez stated that "it was fine." *Id.* The officers searched the backseat and found no contraband.

The officers then asked Mr. Chavez for consent to search the Cadillac's trunk. Mr. Chavez became increasingly hostile and argumentative and refused to give his consent. Officer McColley placed Mr. Chavez under arrest for DWI.

After Mr. Chavez was arrested, officers drove the Cadillac to the police station and stored the vehicle in a controlled bay. The next morning, officers conducted an exterior search of the Cadillac using a drug-sniffing dog. The dog alerted to the trunk of the vehicle, and the officers obtained a warrant to search that area. During the ensuing search, officers found approximately one-third of a pound of cocaine and one-third of a pound of marijuana in the Cadillac's trunk.

### B. Procedural History

### 1. *The Indictment and Conviction*

Mr. Chavez was indicted for one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C). He filed a motion to suppress all of the evidence seized during the search of the Cadillac, arguing that: (1) Officer McColley did not have reasonable suspicion to initiate the traffic stop, (2) Officer McColley had unreasonably extended the scope of the traffic stop, (3) Officer McColley lacked probable cause to arrest him for DWI, and (4) his consent to search the passenger compartment of the vehicle was involuntary. After conducting two hearings, the United States District Court for the District of New Mexico denied the motion and allowed the evidence to be admitted.

In May 2010, Mr. Chavez entered a conditional guilty plea to one count of possession of cocaine with the intent to distribute. As a condition of his plea, Mr. Chavez reserved the right to appeal the district court's denial of his motion to suppress.

### 2. *Mr. Chavez's Sentence*

In preparation for sentencing, the United States Probation Office prepared a presentence report ("PSR"), which classified Mr. Chavez as a career offender under section 4B1.1 of the Sentencing Guidelines. Mr. Chavez's classification as a career offender resulted in an advisory guideline range of 151 to 188 months of imprisonment.

In July 2010, Mr. Chavez filed objections to the PSR, arguing that his prior conviction for attempted drug trafficking did not qualify as a predicate offense for career offender status. Mr. Chavez also asked the court to grant him a variance from the advisory guideline range.

At his sentencing hearing, Mr. Chavez reasserted his objection to being classified as a career offender. He argued that the United States Sentencing Commission (the "Sentencing Commission" or "Commission") had exceeded the scope of its statutory authority by including "attempts" as predicate offenses for career offender status. The district court rejected Mr. Chavez's arguments, but granted his request for a variance from the advisory guideline range. The court sentenced Mr. Chavez to 120 months of imprisonment.

## II. DISCUSSION

On appeal, Mr. Chavez argues that the district court erred in denying his motion to suppress. He also argues that the district court erred in ruling that he qualifies as a career offender under the Sentencing Guidelines. We address each argument in turn.

### A. *The Motion to Suppress*

Mr. Chavez challenges the district court's denial of his motion to suppress on four grounds. He first argues the police lacked reasonable suspicion to stop him. Second, he contends the police lacked probable cause to arrest him for DWI. Third, he claims the scope of his detention was unreasonable. Fourth, he asserts the consent he gave to search the Cadillac "was insufficient to attenuate the illegal stop and detention." Aplt. Br. at 2.

"Upon review of the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Polly*, 630 F.3d 991, 996 (10th Cir. 2011) (quotations omitted).

We address Mr. Chavez's arguments in two parts.  First, we analyze the stop and conclude it was constitutionally sound.  Second, we review the record and conclude there was ample probable cause to arrest Mr. Chavez, a conclusion that also resolves his detention and consent to search issues.

### 1.  Reasonable Suspicion to Initiate the Traffic Stop

Mr. Chavez first argues that the district court erred in denying his motion to suppress because the evidence obtained against him resulted from a traffic stop that lacked reasonable suspicion at its outset, in violation of the Fourth Amendment.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It is well established that a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Trestyn*, 646 F.3d 732, 741 (10th Cir. 2011).  It is also well established that "a routine traffic stop is more analogous to an investigative detention than to a custodial arrest."  *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008).

"The principles governing investigative detentions outlined in *Terry v. Ohio*, 392 U.S. 1, 68 (1986), govern the lawfulness of traffic stops."  *United States v. Stephenson*, 452 F.3d 1173, 1176 (10th Cir. 2006).  Applying the principles announced in *Terry* to the traffic stop context, we have explained that a stop "is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime [or traffic violation]."  *United*

*States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (quotations omitted), *petition for cert. filed* (U.S. July 05, 2011) (No. 11-5180); *see also United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) ("A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction.").

Although "reasonable suspicion requires [an] officer to act on something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required . . . is considerably less than proof by a preponderance of the evidence or that required for probable cause." *McHugh*, 639 F.3d at 1255-56 (quotations and brackets omitted). In determining whether reasonable suspicion exists, "we look to the totality of the circumstances, rather than assessing each factor or piece of evidence in isolation." *Id.* at 1256 (quotation omitted). In so doing, we "defer to the ability of . . . trained law enforcement officer[s] to distinguish between innocent and suspicious actions" and we "consider the reasonableness of an officer's actions using an objective standard." *Id.* (quotations omitted). "The detaining officer's subjective beliefs and intentions are, quite simply, irrelevant." *Id.* (quotations omitted).

The Supreme Court has recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quotation omitted). Whether a tip provides reasonable suspicion to make a traffic stop is case-specific. Although no single factor is dispositive, relevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some

-10-

details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant. *See, e.g.*, *United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (considering these factors and concluding that information from an informant was sufficiently reliable to establish reasonable suspicion); *United States v. Brown,* 496 F.3d 1070, 1078-79 (10th Cir. 2007) (same).

All of these factors were present in this case. First, although the caller did not provide dispatchers with his name, he told them he was a Wal-Mart employee at a specific Wal-Mart store and thereby provided the police with information to discover his identity. Second, he stated he had witnessed the events in the parking lot firsthand. Third, he provided the dispatchers with detailed information about the events he witnessed, including the model of each vehicle involved in the disturbance and each vehicle's license plate number. Fourth, he explained he was calling to report a disturbance in his employer's parking lot, which explained his motivation for reporting the incident to police. Finally, Officer McColley verified some of the information provided by the caller—including that there was a black pickup truck and a white Cadillac in the parking lot—before stopping Mr. Chavez. Based on these circumstances, we hold that the caller's tip bore "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *See J.L.*, 529 U.S. at 270 (quotation omitted).

-11-

Mr. Chavez argues that the 911 call that precipitated his detention was similar to the call held unreliable by the Supreme Court in *J.L.* We disagree. In *J.L.*, during an undocumented and unrecorded telephone call, an anonymous informant stated that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. The Court held that the informant's tip was unreliable and insufficient to justify a police officer's stop and frisk of the defendant. *Id.*

In *J.L.*, "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271. Here, the caller provided far more identifying information and specific details about the events he witnessed than the informant in *J.L.*

In *Brown*, we explained that a caller who refuses to provide his name "is not anonymous in the same sense as the caller in *J.L.* was anonymous" if the caller "provides sufficient details regarding his identity to render him readily identifiable by police." 496 F.3d at 1076. As explained above, that is precisely what occurred in this case. Because the caller provided sufficient information from which he could be identified and because the police were able to corroborate some of the information he provided, we reject Mr. Chavez's argument that the caller's tip was equivalent to the tip found unreliable in *J.L.*

In sum, recognizing the significant "skepticism and careful scrutiny" required in the anonymous informant context, *see Copening*, 506 F.3d 1241 at 1247 (quotations omitted), we conclude that, under the totality of the circumstances, the caller's tip bore "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory

stop."  *See J.L.*, 529 U.S. at 270 (quotation omitted).  We emphasize, however, that this conclusion is based on the collective facts before us.  *See Copening*, 506 F.3d at 1248.

## 2.  *Probable Cause to Arrest, Continued Detention, and Consent to Search*

Mr. Chavez next argues that Officer McColley violated his rights under the Fourth Amendment by arresting him without probable cause and by expanding the scope of the initial stop without reasonable suspicion or probable cause.  He also argues that his consent to search the Cadillac did not render the stop or detention constitutional.  The arrest and detention issues are analytically linked, and we address them together.  *See Rodriguez-Rodriguez*, 550 F.3d at 1227.

Mr. Chavez argues that "after 20 minutes without arresting [him] for DWI, the officers changed the detention from a 'disturbance' investigation into a drug investigation."  Aplt. Br., at 21.  He contends this extended detention constituted an illegal arrest.

Mr. Chavez is correct that "[i]f a police-citizen encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest that must be supported by probable cause." *Rodriguez-Rodriguez*, 550 F.3d at 1227 (quotations omitted).  Here, however, we need not determine whether Officer McColley expanded the scope of the stop twenty minutes after he initiated it because we conclude he had probable cause to arrest Mr. Chavez for DWI within nine minutes of initiating the stop.

We have previously indicated that, in some situations, it is unnecessary to determine whether an investigative detention amounts to an arrest if there is a finding of

probable cause, "because in such circumstances, an arrest [or detention] would not violate the Fourth Amendment." *See id.*; *see also United States v. Burnside*, 588 F.3d 511, 518 (7th Cir. 2009) ("[The defendant] further argues that, even if officers had reasonable suspicion to perform a *Terry* stop, they impermissibly exceeded those limits . . . . We need not address this argument, however, because the officers had probable cause to arrest [the defendant]."); *United States v. Long*, 464 F.3d 569, 575 n.2 (6th Cir. 2006) ("It is unnecessary for us to address the closer question of whether [Officer] McGuffee[] . . . exceeded the bounds of a permissible *Terry* stop because [Officer] McGuffee had probable cause to arrest [the defendant] at this point.").

Although probable cause to arrest is not necessary to justify the extension of an investigative detention, it is sufficient. *See Rodriguez-Rodriguez*, 550 F.3d at 1226. Accordingly, even if Officer McColley extended the scope of the initial traffic stop by detaining Mr. Chavez while waiting for a drug dog to arrive, such an extension would not violate the Fourth Amendment if Officer McColley had probable cause to arrest Mr. Chavez. *See id.; see also United States v. Sturgis*, 238 F.3d 956, 959 (8th Cir. 2001) ("Because the agents could have arrested [the defendant], they didn't violate the Constitution by detaining [the defendant] for two hours while awaiting the arrival of the canine unit."); *cf. United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998) ("[D]etention of the driver at the scene to accomplish a canine sniff is generally reasonable where the driver is already under lawful arrest.").

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are

-14-

sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela,* 365 F.3d 892, 896 (10th Cir. 2004) (quotation omitted). "Probable cause is measured against an objective standard of reasonableness and may rest on the collective knowledge of all officers involved in an investigation rather than solely on the knowledge of the officer who made the arrest." *United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1209 (10th Cir. 2007). In determining whether probable cause to arrest exists, we "evaluate[] . . . the circumstances as they would have appeared to prudent, cautious and trained police officers." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999) (quotation omitted).

The district court concluded that "[w]ithin nine minutes of [initiating] the stop, Officer McColley had probable cause to arrest Mr. Chavez for [DWI]." *Chavez I*, at 18-19. The court based this conclusion on several factual findings. First, immediately upon contacting Mr. Chavez, "Officer McColley observed that Mr. Chavez's eyes were bloodshot and watery and he detected the odor of alcohol emanating from Mr. Chavez." *Id.* at 3. Second, Mr. Chavez admitted to Officer McColley that "he had a couple of beers" prior to the stop. *Id.* at 5. Third, Officer McColley performed three field sobriety tests on Mr. Chavez and was "certain that Mr. Chavez was intoxicated" based on his observations during the tests. *Id.* at 6, 18.

We agree with the district court that, based on the totality of the circumstances, these facts provided probable cause for Officer McColley to arrest Mr. Chavez for DWI. *See, e.g.*, *Schmerber v. California,* 384 U.S. 757, 768-69 (1966) (probable cause to arrest existed when driver's breath smelled from alcohol and the driver's eyes were bloodshot,

-15-

watery, and glassy); *Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) (holding that an officer had probable cause to arrest a driver for DUI where the officer "observed several indicia of [the driver's] alcohol consumption[,] including a moderate odor of alcohol, pinkish and watery eyes, a flushed face, unusually slow and deliberate speech, and slow hand movements" and the driver "refused to participate in a field sobriety test"); *see also Sherbrooke v. City of Pelican Rapids*, 577 F.3d 984, 987-88 (8th Cir. 2009) (holding that an officer had probable cause to arrest for DWI after he detected alcohol on the driver's breath, the driver admitted to drinking, and the driver failed one of three field sobriety tests).

Mr. Chavez attempts to bolster his argument that Officer McColley lacked probable cause to arrest him by contending that the DWI arrest was just a ruse to justify a drug investigation. We reject this argument. "Under the Fourth Amendment, the constitutionality of an arrest does not depend on the arresting officer's state of mind." *Howards v. McLaughlin*, 634 F.3d 1131, 1142 (10th Cir. 2011), *petition for cert. filed* (U.S. Aug. 25, 2011) (No. 11-262); *see also Whren v. United States*, 517 U.S. 806 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (quotation omitted)); *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008) ("[A]n officer's own subjective reason for [an] arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime.").

Indeed, we stated in *Howards* that "the subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause. An arrest is not invalid under the Fourth Amendment . . . so long as the circumstances,

-16-

viewed objectively, justify the arrest."  634 F.3d at 1142 (quotations omitted); *see also*

*United States v. Robinson*, 414 U.S. 218, 221 n.1 (1973) (noting that a traffic violation

arrest would not be rendered invalid by the fact it was "a mere pretext for a narcotics

search").  Here, the circumstances, viewed objectively, justified Officer McColley in

arresting Mr. Chavez for DWI.  Officer McColley's alleged subjective intentions are

therefore irrelevant to our probable cause analysis.

Mr. Chavez also argues that if Officer McColley had probable cause to arrest him

for DWI within nine minutes of initiating the stop, he should have placed him under

arrest and terminated his investigation.  This argument lacks merit.  It is well established

that "[l]aw enforcement officers are under no constitutional duty to call a halt to a

criminal investigation the moment they have the minimum evidence to establish probable

cause." *Kentucky v. King*, 131 S. Ct. 1849, 1860-61 (2011) (quoting *Hoffa v. United

States*, 385 U.S. 293, 310 (1966); *see also United States v. Bengivenga*, 845 F.2d 593,

596 (5th Cir. 1988) ("Police officers are not required to effectuate an arrest the moment

probable cause arises."); *United States v. Chadwick*, 415 F.2d 167, 172 (10th Cir. 1969)

("Enforcement officers are under no duty to make an arrest even in the face of probable

cause.").  Based on this precedent, we reject Mr. Chavez's argument that Officer

McColley was required to place him under arrest the moment he had probable cause to

believe he was driving while intoxicated.

In sum, we hold that Officer McColley had reasonable suspicion to stop Mr.

Chavez and probable cause to detain and arrest Mr. Chavez for DWI.  We therefore

affirm the district court's denial of his motion to suppress.  Because neither the stop nor

the detention violated Mr. Chavez's rights under the Fourth Amendment, we need not reach his argument that the consent he gave to search the Cadillac "was insufficient to attenuate the illegal stop and detention."

### 3. Career Offender Status

We next address Mr. Chavez's argument that the district court erred in concluding he qualified as a career offender under the Sentencing Guidelines based on his prior conviction for attempted drug trafficking. "In reviewing the district court's application of the Sentencing Guidelines, this court reviews legal questions de novo." *United States v. Maestas*, 642 F.3d 1315, 1319 (10th Cir. 2011).

Section 4B1.1 of the Sentencing Guidelines states that a defendant qualifies as a career offender if: (1) the defendant was at least eighteen years old at the time he or she committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. Mr. Chavez does not dispute that the first and second criteria for career offender status apply to him. The issue before us focuses on the third requirement—whether Mr. Chavez's prior conviction for attempted drug trafficking properly constitutes a controlled substance offense under section 4B1.1.[1]

---

[1] To qualify for career offender status, a defendant must have at least two prior felony convictions of either a crime of violence or a controlled substance offense. *See* U.S.S.G. § 4B1.1. The district court found that Mr. Chavez had been convicted of two felony controlled substance offenses. On appeal, Mr. Chavez does not dispute that one of

The Guidelines define the phrase "controlled substance offense" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance." U.S.S.G. § 4B1.2. The background commentary to the Guidelines further provides that the phrase "controlled substance offense" includes "the offenses of aiding and abetting, conspiring, and *attempting* to commit such offenses." U.S.S.G. § 4B1.2 cmt. n.1 (emphasis added). Although this expanded definition appears in the commentary and not in the actual guidelines, the Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Mr. Chavez acknowledges that the background commentary to the Guidelines expressly states that his prior conviction for attempted drug trafficking qualifies as a predicate offense for career offender status. But he argues that the Sentencing Commission exceeded its statutory authority by including attempts to commit drug crimes as offenses that trigger application of career offender status.

We considered a similar argument in *United States v. Allen*, 24 F.3d 1180 (10th Cir. 1994). In *Allen*, the defendant argued that the Sentencing Commission "exceeded the mandate in section 994(h) when it included conspiracy as a qualifying offense" for

_____

his prior convictions qualifies as a predicate offense for career offender status. We therefore address only his other conviction, which was for attempted drug trafficking.

career offender status. *Id.* at 1186. We rejected this argument. *See id.* at 1186-87. We noted that the then-applicable commentary to the career offender provision stated that the provision "implement[ed] the Congressional mandate to the Commission in 28 U.S.C. § 994(h)". *Id.* at 1185. In relevant part, section 994(h) requires the Sentencing Commission to set a term of imprisonment at near the maximum term authorized for an adult defendant who: "(1) [is] convicted of a felony that is . . . an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841) . . .; and (2) . . . has previously been convicted of two or more prior felonies, each of which is . . . an offense described in section 401 of the Controlled Substances Act, [or various] sections . . . of the Controlled Substances Import and Export Act." We recognized that conspiracy convictions were not specifically identified in section 994(h) as an offense triggering career offender status. *Allen*, 24 F.3d at 1185. But we determined that "section 994(h) does not represent an exclusive list of crimes for which enhancement under the career offender guidelines may be imposed" and "does not, by mandating enhancement for certain crimes, preclude the Commission from enhancing others if it is within the Commission's grant of discretion to do so." *Id.* at 1186.

We then explained that "Congress gave the Sentencing Commission very broad discretion in drafting the guidelines." *Id.* As one example of this broad authority, we quoted 28 U.S.C. § 994(a), which gives the commission authority "to promulgate guidelines . . . which define [an] appropriate . . . term of imprisonment." *Id.* (quotations omitted). We concluded that "[a]lthough the current background commentary to section 4B1.1 identifie[d] section 994(h) as the source of the mandate implemented by the

-20-

guideline, it [was] clear the Commission could rely on the broader language of section 994(a), which in turn refers to all other parts of section 994, to include conspiracy-related offenses in the career offender guideline." *Id.* at 1187.

Since our opinion in *Allen*, the Sentencing Commission amended the background commentary to the career offender provision. As noted above, the prior version of the commentary stated that the career offender provision "implement[ed] the Congressional mandate to the Commission in 28 U.S.C. § 994(h)." *Id.* at 1185. The current version states:

> Section 994(h) of Title 28, United States Code, mandates that the Commission assure that certain "career" offenders receive a sentence of imprisonment "at or near the maximum term authorized." Section 4B1.1 implements this directive, with the definition of a career offender tracking in large part the criteria set forth in 28 U.S.C. § 994(h). *However, in accord with its general guideline promulgation authority under 28 U.S.C. § 994(a)-(f), and its amendment authority under 28 U.S.C. § 994(o) and (p), the Commission has modified this definition in several respects to focus more precisely on the class of recidivist offenders for whom a lengthy term of imprisonment is appropriate and to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct . . . ."* 28 U.S.C. § 991(b)(1)(B).

U.S.S.G. § 4B1.1 cmt. background (emphasis added).

As we recognized in *Allen*, through section 994(a) Congress has given the Sentencing Commission broad discretion in drafting the Guidelines. *See* 24 F.3d at 1186. That the Commission relied on this broad grant of authority in defining the term "controlled substance offense"—and that it did *not* rely solely on its promulgation authority under 28 U.S.C. § 994(h)—is clear from the amendments to the background

-21-

commentary. *See* U.S.S.G. § 4B1.1 cmt. background. Indeed, the current version of the commentary expressly states that the Sentencing Commission has modified the definition of "controlled substance offense" "in accord with its general guideline promulgation authority under 28 U.S.C. § 994(a)-(f)." *Id.*

Section 994(a)(1)(B) directs the Sentencing Commission to promulgate "guidelines [which define] the appropriate . . . term of imprisonment." In establishing categories of offenses and their appropriate terms of imprisonment, the Commission is authorized to consider, among other factors, "the nature and degree of the harm caused by the offense," "the community view of the gravity of the offense," and "the deterrent effect a particular sentence may have on the commission of the offense by others." 28 U.S.C. § 994(c)(3)-(6).

We conclude that the Commission acted within this broad grant of authority in construing attempts to commit drug crimes as controlled substance offenses for purposes of determining career offender status.[2] Because the commentary interprets controlled substance offenses as including convictions for attempted drug trafficking, and because the commentary is authoritative, the district court properly determined that Mr. Chavez

_____

[2] We note that other circuits have reached the same conclusion. *See, e.g.*, *United States v. Smith*, 54 F.3d 690, 693 (11th Cir. 1995) ("[W]e hold that the Commission, in construing attempts to commit narcotics crimes as controlled substance offenses for purposes of determining career offender status, acted within its authority pursuant to section 994(a)."); *United States v. Mendoza-Figueroa*, 65 F.3d 691, 694 (8th Cir. 1995) (same); *United States v. Jackson*, 60 F.3d 128, 133 (2d. Cir. 1994) ("[W]e conclude that both 28 U.S.C. §§ 994(a) and 994(h) vested the Commission with authority to expand the definition of 'controlled substance offense' to include aiding and abetting, conspiring, and *attempting* to commit such offenses." (emphasis added)).

should be classified as a career offender.  We therefore affirm Mr. Chavez's sentence.

### III.  CONCLUSION

For the reasons discussed above, we hold that Officer McColley had reasonable suspicion to stop the vehicle Mr. Chavez was driving.  We further hold that Mr. Chavez's detention and arrest following the stop were supported by probable cause.  Finally, we hold that the district court correctly found that Mr. Chavez qualifies as a career offender under the Sentencing Guidelines based on his prior conviction for attempted drug trafficking.  Based on these conclusions, we **affirm** Mr. Chavez's conviction and sentence.