**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 12, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DESMOND S. GAINES,

      Defendant - Appellant.

No. 17-3270

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:15-CR-20078-JAR-1)**

_____

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Kansas Federal Public Defender, Topeka, Kansas, for the Defendant-Appellant.

Stephen A. McAllister, United States Attorney (Carrie N. Capwell, Assistant United States Attorney, with him on the brief), Office of the United States Attorney, Kansas City, Kansas, for the Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **McHUGH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

      This appeal stems from a search, which took place after the police spoke with the defendant, Mr. Desmond Gaines. After a brief exchange,

Mr. Gaines fled but was soon captured. The police then found cocaine, marijuana, PCP, drug paraphernalia, over $640, and a handgun. Mr. Gaines unsuccessfully moved to suppress this evidence. He now appeals,[1] and we focus on two issues:

1.  *The existence of a seizure.* Two uniformed police officers approached Mr. Gaines with flashing roof lights and confronted him about a report that he was selling PCP. Did this confrontation entail a seizure? The answer turns on whether a reasonable person would have felt free to leave or terminate the encounter. We answer "no" and characterize the encounter as a seizure.

2.  *The attenuation of a possible Fourth Amendment violation.* After effecting a seizure, the police allegedly acquired probable cause and learned of an outstanding arrest warrant. Did the development of probable cause or the subsequent discovery of the arrest warrant attenuate the connection between the seizure and the evidence? We answer "no," so introduction of the evidence can't be supported by attenuation of a Fourth Amendment violation.

Given our conclusions on these two issues, we vacate the denial of Mr. Gaines's motion to suppress.

**I.    The Kansas City police approach Mr. Gaines in marked police cars and question him about a report that he is selling PCP.**

One morning, the police in Kansas City, Kansas, received a 911 call reporting that a man dressed in red had just sold drugs in a parking lot.

---

[1]    After a trial, Mr. Gaines was convicted of (1) possessing cocaine base, PCP, and marijuana with intent to distribute, (2) possessing a firearm in furtherance of a drug-trafficking crime, and (3) possessing a firearm after a felony conviction. But the appeal involves only the ruling on Mr. Gaines's motion to suppress.

2

Based on this information, police officers Carl Rowland and Shenee Davis responded.

The police officers pulled into the parking lot in two separate police cars and turned on their roof lights.[2] They parked behind a car in which a man in red clothing (Mr. Gaines) was seated. Officer Rowland gestured for Mr. Gaines to get out of the car. He did, and Officer Rowland confronted Mr. Gaines with the report that he was selling drugs. The police officers soon observed an open container of alcohol and smelled PCP. When they said they were going to detain Mr. Gaines, he grabbed a pouch from his car and fled. The police caught Mr. Gaines and discovered the evidence that underlies this appeal.

## II.    Was there a seizure?

The threshold issue is applicability of the Fourth Amendment. This amendment applies if the police had seized Mr. Gaines; it doesn't if the encounter had been consensual. *United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008). The district court characterized the entire encounter as consensual. To determine whether the encounter was consensual or constituted a seizure, we apply a dual standard of review, using the clear-error standard for the district court's findings of historical fact and de

---

[2]    In videos of the stop, it is hard to tell whether Officer Davis's roof lights were on. But Officer Davis testified in the suppression hearing that she had activated her roof lights.

3

novo review for the court's legal conclusions. *United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017).[3]

The existence of a seizure involves a matter of law. *See United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (stating that determining "when the seizure occurred . . . is a legal [question]"). On this matter of law, we consider whether Mr. Gaines yielded to a police officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626–27 (1991). To answer this question of law, we apply an objective test, considering whether a reasonable person would have felt free to leave or terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 436 (1991). We apply this objective test to the historical facts, which are largely undisputed. Even if a reasonable person would not have felt free to leave, a seizure would

---

[3]    When considering whether the district court clearly erred, we have often said that we view the evidence in the light most favorable to the district court's ruling or to the prevailing party. *See United States v. Salazar*, 609 F.3d 1059, 1063 (10th Cir. 2010) (favorable to the prevailing party); *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (favorable to the district court's determination). Mr. Gaines challenges these statements, urging us to jettison our existing approach. But one panel of this court can't overrule another panel. *United States v. Doe*, 865 F.3d 1295, 1298 (10th Cir. 2017). So we continue to view the evidence in the light most favorable to the district court's ruling or to the prevailing party. *E.g.*, *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017).

occur only if the suspect yielded to a police officer's show of authority. *Hodari D.*, 499 U.S. at 626–27.

So let's consider how a reasonable person would have felt, facing the same circumstances that Mr. Gaines confronted. The encounter began with Mr. Gaines sitting in his car in a parking lot. Two uniformed police officers arrived in marked police cars, both flashing their roof lights. Would a reasonable person have felt free to leave? Perhaps. But the flashing roof lights,[4] two marked police cars, and two uniformed officers[5] would undoubtedly have cast at least some doubt on a reasonable person's belief in his or her freedom to leave.

This doubt would likely have intensified in Kansas (where Mr. Gaines was stopped) because of Kansas's traffic laws. *See Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984) (considering the laws of most states, which criminalize the failure to heed a police officer's signal to

---

[4] *See* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.4(a), at 598–99 (5th ed. 2012) (stating that the "use of flashing lights as a show of authority . . . will likely convert the event into a Fourth Amendment seizure").

[5] *See United States v. Williams*, 615 F.3d 657, 660 (6th Cir. 2010) ("Williams was seized: a reasonable person would not have felt free to leave upon being approached by two uniformed officers in a marked car, singled out of a group, and immediately accused of a crime."); *see also United States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006) (stating that the presence of uniformed officers bears on whether a police encounter constitutes a seizure).

stop, as informative on whether the defendant reasonably believed that he wasn't free to leave). Under Kansas law, motorists must stop whenever a police officer flashes his or her emergency lights. Kan. Stat. Ann. § 8-1568(a)(1), (d).

The district court minimized the impact of the flashing roof lights, crediting testimony by the police officers that they had activated their lights only because their cars were blocking a lane of traffic. But the officers' subjective intent had little bearing on whether a reasonable person would have thought that he or she could leave. *See Brendlin v. California*, 551 U.S. 249, 260–61 (2007) ("The intent that counts under the Fourth Amendment" is the intent conveyed to the suspect, and the court does not consider the officers' "subjective intent when determining who is seized."); *see also United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980) (concluding that a law-enforcement agent's "subjective intention . . . to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent").

But let's assume that a reasonable person would have felt free to drive away at this point.[6] One of the police officers then exited his car and

---

[6]     If the police officers had followed and reactivated their roof lights, Kansas law would have required the person to pull over. *See* Kan. Stat. Ann. § 8-1568(a)(1), (d); *State v. Morris*, 72 P.3d 570, 577 (Kan. 2003).

6

gestured for Mr. Gaines to get out of the car. Here is what our reasonable person would have seen:



At a minimum, the police officer's gesture would have cast further doubt on a reasonable person's belief that he or she was free to drive away. *See Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 462 (4th Cir. 2013) (holding that two deputy sheriffs' gestures to stay seated constituted a seizure).

But let's assume that a reasonable person would still have felt free to leave. As Mr. Gaines exited the car, one police officer stood just a few feet away and said that they had come because of a report that Mr. Gaines was "up here selling some dope." The police officer then asked Mr. Gaines

7

whether he had been selling "wet" (street-language for PCP). Meanwhile, another uniformed police officer circled the car, looking inside.[7]



Would a reasonable person have felt free to leave? At a minimum, the accusatory question would have added to the reasonable person's doubt about his or her freedom to return to the car and drive away. *See United States v. Glass*, 128 F.3d 1398, 1407 (10th Cir. 1997) (stating that "particularized focus" on an individual "is certainly a factor" to consider when determining whether a seizure took place).[8]

---

[7] At a hearing, a prosecutor told the district court that the police officers had "encircle[d] the location" because the situation was "heightened." R., vol. I at 372.

[8] We have sometimes cautioned that the mere existence of incriminating questions is not relevant to the existence of a seizure. *See United States v. Little*, 18 F.3d 1499, 1506 (10th Cir. 1994) (en banc); *United States v. Ringold*, 335 F.3d 1168, 1173 (10th Cir. 2003). We do not question these cautionary statements. But here the police officer didn't just ask incriminating questions; he began by explaining that he had come (with roof lights flashing) because of a report that this person was selling drugs

These were the five circumstances that confronted Mr. Gaines:

1.    He was sitting in his car when two marked police cars approached and stopped right behind him with their roof lights flashing.

2.    Both police officers were uniformed.

3.    One police officer gestured for Mr. Gaines to get out of his car.

4.    Mr. Gaines exited his car, and one of the police officers said that they had come based on a report that he was selling PCP in the parking lot.

5.    While one police officer told Mr. Gaines that someone had accused him of selling PCP, the other police officer circled Mr. Gaines's car and looked inside.



---

in the parking lot. *See United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015) ("The line between a consensual conversation and a seizure is crossed when police convey to an individual that he or she is suspected of a crime.").

9

Viewing these circumstances as a whole, we conclude that (1) the police officers showed their authority and (2) no reasonable person would have felt free to leave.

Still, the encounter would constitute a seizure only if Mr. Gaines had yielded to the show of authority. He ultimately fled, so the government denies that Mr. Gaines yielded. We disagree. One officer gestured for Mr. Gaines to get out of his car, and he did. When Mr. Gaines was asked questions, he responded. *See United States v. Camacho*, 661 F.3d 718, 726 (1st Cir. 2011) (stating that a suspect "submitted" to a police officer's "show of authority by responding to his questions"). And when Mr. Gaines was asked for his identification, he opened his car trunk to look for his identification.

Mr. Gaines then fled. But by that point, he had already yielded to the show of authority. We addressed a similar issue in *United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991). There the defendant exited his car and fled after asking the officer: "What do you want?" *Morgan*, 936 F.2d at 1566. We considered this single question enough to conclude that the defendant had yielded to authority. *Id.* at 1567. By comparison, Mr. Gaines had done more to yield: getting out of his car, answering the officer's questions, and looking for his identification.

We thus conclude that Mr. Gaines was seized.

10

**III.** **Even if the seizure itself had been improper, would the attenuation doctrine permit introduction of the subsequently discovered evidence?**

The government argues that even if the seizure had been improper, it would have had only an attenuated connection to the later discovery of evidence. This argument is based on the attenuation doctrine. Under this doctrine, a constitutional violation leading to the discovery of evidence does not require exclusion when only an attenuated connection exists between the constitutional violation and discovery of the evidence. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

To invoke the attenuation doctrine, the government bears a "heavy burden." *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010). Trying to satisfy this burden, the government alleges two attenuating circumstances:

1. An outstanding arrest warrant existed for Mr. Gaines prior to the encounter.

2. The police officers obtained probable cause to search the car based on the smell of PCP and observation of an open container of alcohol.

The district court found attenuation based on the outstanding arrest warrant. The court didn't address probable cause, but the government points to probable cause as an alternative basis to affirm the finding of attenuation. In our view, attenuation cannot be based on either the arrest warrant or the eventual development of probable cause.

11

## A. Arrest Warrant

When the police officers searched the car, they did not know of any outstanding arrest warrants. But shortly after conducting the search and arresting Mr. Gaines, the police learned that he had an outstanding arrest warrant. Based on the discovery of the warrant, the district court found that the attenuation doctrine would allow introduction of the evidence even if the initial encounter had constituted an unlawful seizure. We disagree because (1) the execution of the arrest warrant might not have allowed a search of the car and (2) two of the attenuation doctrine's three factors support exclusion.

We again apply a dual standard of review, using the clear-error standard for findings of historical fact and de novo review for legal conclusions. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

The arrest warrant might have led to an arrest, and arresting Mr. Gaines would have allowed the police to conduct a search incident to an arrest. *Chimel v. California*, 395 U.S. 752, 762–63 (1969). For a search incident to an arrest, the police could search Mr. Gaines's person and places within his immediate control at the time of the search. *See United States v. Edward*, 632 F.3d 633, 643 (10th Cir. 2001); *see also United States v. Knapp*, No. 18-8031, slip op. at 12, ___ F.3d ___ (10th Cir. Mar. 5, 2019) (to be published) ("We therefore join the Third Circuit in interpreting *Gant* as focusing attention on the arrestee's ability to access

12

weapons or destroy evidence at the time of the search, rather than the time of the arrest, regardless of whether the search involved a vehicle.").

Here, the evidence at issue was in Mr. Gaines's car. If the police had arrested Mr. Gaines based on the arrest warrant, he might or might not have been within reach of the car at the time of the search. If Mr. Gaines was not within reach, the police could not have searched the car incident to the arrest. *See Arizona v. Gant*, 556 U.S. 332, 343 (2009) (stating that the police can "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search").

At oral argument, the government theorized for the first time that the police could have impounded the car and conducted an inventory search. Though the district court didn't consider these theories, we can ordinarily consider alternative arguments to affirm if the record is adequately developed. *United States v. Bagley*, 877 F.3d 1151, 1154 (10th Cir. 2017). Here, however, the government did not present this contention until oral argument. We typically decline to consider an appellee's contentions raised for the first time in oral argument. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 588 (10th Cir. 2016) (rejecting an appellee's contention to affirm on an alternative ground because the contention was raised for the first time at oral argument).

13

Even if we were to consider the government's new contention, however, we would reject it. To conduct an inventory search, the government had to prove that the police could lawfully impound Mr. Gaines's car. *See United States v. Sanders*, 796 F.3d 1241, 1244 (10th Cir. 2015) ("The government bears the burden of proving that its impoundment of a vehicle satisfies the fourth Amendment."). To satisfy this burden, the government had to show that the police had standardized criteria justifying impoundment and a legitimate community-caretaking reason to impound the car. *Id.* at 1248.

Here the government presented no evidence of standardized criteria for impoundment. Even with such evidence, however, the police could impound the car only upon proof of a community-caretaking rationale. For example, impoundment might have been permissible if the car had obstructed traffic or imperiled public safety. *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976). But we lack any evidence that the car was illegally parked or imperiling public safety.[9]

But let's generously assume that the police could have searched the car based on (1) discovery of the arrest warrant or (2) impoundment of the

---

[9]     After arresting Mr. Gaines, the police didn't impound the car. Instead, the police gave the keys to Mr. Gaines's acquaintance, who delivered the car to Mr. Gaines's mother.

car. Even with this assumption, we could apply the attenuation doctrine only after considering three factors:

1.  the "temporal proximity" between the Fourth Amendment violation and discovery of the evidence

2.  the presence of "intervening circumstances"

3.  the "purpose and flagrancy" of the officer's wrongdoing

*Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). The first two factors favor suppression of the evidence; only the third arguably favors the government.

The first factor (temporal proximity) supports Mr. Gaines because the evidence was discovered only minutes after the seizure. *See Utah v. Strieff*, 136 S. Ct. 2056, 2062 (2016).

The third factor (the purpose and flagrancy of the police wrongdoing) supports the government. The police officers arguably should have known that the encounter constituted a seizure. But the district court found that the police had been negligent (at worst). This finding was reasonable because the issue of reasonable suspicion is close. (We discuss this issue below.) So if the search had been unlawful, the police would have been (at worst) negligent.

We also consider the second factor (the presence of intervening circumstances between the allegedly unlawful stop and discovery of the evidence). This factor supports Mr. Gaines because the arrest warrant

15

wasn't discovered until after the search. *See United States v. Gaines*, 668 F.3d 170, 175 (4th Cir. 2012) (concluding that when evidence is discovered prior to the defendant's independent criminal act, this criminal act cannot serve as "an intervening event" to purge the taint of an unlawful police action); *United States v. Beauchamp*, 659 F.3d 560, 574 (6th Cir. 2011) (concluding that no intervening circumstances existed because the new ground for the search had arisen after discovery of the evidence); *United States v. Camacho*, 661 F.3d 718, 730–31 (1st Cir. 2011) (same).

The government contends that if Mr. Gaines had not fled, the police

- would have learned of the arrest warrant before searching the car and

- might have impounded the car.

For the sake of argument, we can assume that the government is right. But the attenuation doctrine addresses events as they actually occurred, not as they might have transpired. Thus, the arrest warrant and potential impoundment do not attenuate the connection between a possible Fourth Amendment violation and discovery of the evidence.

## B.    Probable Cause

The government also insists that the development of probable cause would have triggered the attenuation doctrine. We reject this argument.

According to the government, the police officers obtained probable cause when they smelled PCP and observed an open container of alcohol in

16

Mr. Gaines's car. But even if probable cause existed, it would have flowed directly from the seizure. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). So the discovery of evidence would still be traced directly to the possible Fourth Amendment violation. *See id*. Given this direct causal connection, the eventual development of probable cause would not trigger the attenuation doctrine.[10]

## IV.   Was the police's suspicion reasonable?

Even though Mr. Gaines was seized, the seizure would have been permissible if the police had a reasonable ground to suspect Mr. Gaines of a crime. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The district court didn't address the reasonableness of the police's suspicion. So our threshold decision is whether to decide this issue or remand for the district court to address this issue in the first instance.

Mr. Gaines asks us to remand for the district court to decide the issue in the first instance. We grant this request. The inquiry on reasonable suspicion ordinarily entails a fact-intensive inquiry better suited to the

---

[10]    This argument might succeed in other cases when a suspect commits a new crime during an unlawful seizure. For example, if a suspect resists arrest during the seizure, the new crime of resisting arrest might arguably attenuate the link between the seizure and a subsequent search. *See United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir. 1982) (attenuation when the defendant resisted arrest during an unlawful stop because resisting arrest constituted a "new, distinct crime"). We need not address this issue because the government doesn't allege the commission of a new, distinct crime after the search.

17

district court than to our court. *See United States v. Esquivel-Rios*, 725 F.3d 1231, 1238 (10th Cir. 2013) (Gorsuch, J.) (discussing the benefit of remanding so that the district court could decide reasonable suspicion in the first instance); *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005) (referring to reasonable suspicion as a "fact-intensive" issue). And here, the parties disagree on some potentially material aspects of the inquiry, such as

- whether the 911 caller implied that he or she had observed a drug sale and

- whether either police officer had known of past drug sales in the area where Mr. Gaines was located.

The issue is also close. The police learned of Mr. Gaines through an anonymous tip, and the Supreme Court concluded in *Florida v. J.L.*, 529 U.S. 266 (2000) that an anonymous tip hadn't supplied reasonable suspicion. *J.L.*, 529 U.S. at 271. But the Supreme Court also reached the opposite conclusion in *Navarette v. California*, 572 U.S. 393 (2000). There the Court relied partly on the use of the 911 system, the contemporaneous nature of the call with the reported crime, and the specificity of the information. *Navarette*, 572 U.S. at 398–403. These factors arguably apply here. But in *J.L.*, the Court also suggested the importance of predictive information and corroboration, and both are arguably missing here. *J.L.*, 529 U.S. at 270–71.

18

Given the closeness of the issue and the district court's superior resources for fact-finding, we grant Mr. Gaines's request to remand for the district court to decide whether the police had reasonable suspicion.

## V. Did Mr. Gaines abandon the black pouch?

When Mr. Gaines fled, he threw a black pouch onto the roof of a building. The police later found the pouch, and it contained illegal drugs, cash, and drug paraphernalia. All of this evidence was introduced at the trial. Mr. Gaines alleges that the evidence should have been excluded, and the government contends that Mr. Gaines abandoned the pouch.

The district court didn't address the issue, and the record on abandonment is inadequately developed. We therefore can't consider abandonment as an alternative ground for affirmance. *See* p. 13, above.[11]

## VI. Conclusion

The police effected a seizure when two uniformed police officers pulled behind Mr. Gaines in marked police cars, using their roof lights and

---

[11] Mr. Gaines argues that the government waived its abandonment argument by failing to raise it in district court. For this argument, Mr. Gaines relies on *United States v. Hernandez*, 847 F.3d 1257, 1262 (10th Cir. 2017), and *United States v. Verner*, 659 F. App'x 461, 466–68 (10th Cir. 2016) (unpublished). In these cases, however, the government was the appellant. *Hernandez*, 847 F.3d at 1260; *Verner*, 659 F. App'x at 462. And we ordinarily allow the government to present new arguments for affirmance when the district court record is adequately developed. *See* p. 13, above (citing *United States v. Bagley*, 877 F.3d 1151, 1154 (10th Cir. 2017)).

pointedly telling Mr. Gaines that they had come because of a report that he was selling drugs in the parking lot. After conducting the search, the police learned of an outstanding warrant and arguably obtained probable cause during their discussion with Mr. Gaines. But neither the arrest warrant nor the later existence of probable cause attenuate the causal connection between the seizure and discovery of the evidence. We thus vacate the denial of Mr. Gaines's motion to suppress.

An issue remains on the existence of reasonable suspicion. This issue is better suited for the district court to decide in the first instance. We thus remand for consideration of the issue involving reasonable suspicion.[12]

---

[12] On remand, the district court is also free to consider the government's argument involving abandonment of the black pouch. The issue of abandonment is fact-intensive and better suited for the district court to decide on a fuller record. *See, e.g.*, *United States v. Driskill*, No. 98-6331, 1999 WL 730954, at *2 (10th Cir. Sept. 20, 1999) (unpublished) ("Whether a defendant 'abandoned' property in the Fourth Amendment sense is a fact-intensive determination which would ordinarily require an adequately developed record.").

17-3270, *United States v. Gaines*

**TYMKOVICH**, CJ., dissenting.

I would affirm the district court because Officers Rowland and Davis had reasonable suspicion to perform a brief investigative stop. And Officer Rowland quickly gained probable cause to arrest Gaines based on the open container plainly visible inside Gaines's vehicle. Although the majority thoroughly and persuasively analyzes the existence of a seizure and the applicability of the attenuation doctrine, I would not reach these two issues. I therefore dissent.

I see no need to remand for the district court to determine reasonable suspicion, despite the district court not reaching the issue below. The government squarely presented the issue to the district court and developed a detailed record regarding the officers' knowledge and observations. And based on this record, the officers had reasonable suspicion to detain Gaines briefly while they investigated possible criminal activity.

We may affirm on an alternative ground when the facts in the record are sufficiently developed and clear. *See United States v. Springer*, 875 F.3d 968, 981 (10th Cir. 2017) ("[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (internal quotation marks omitted)). And we should do so when, as here, an issue will almost certainly return on appeal. I would therefore exercise our

discretion to affirm on this alternative ground, which is more than "adequately supported

by the record." *Davis v. Roberts*, 425 F.3d 830, 834 (10th Cir. 2005).

The Fourth Amendment permits brief investigative stops when law enforcement

officers have "a particularized and objective basis for suspecting the particular person

stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

Whether officers have reasonable suspicion depends "upon both the content of

information possessed by police and its degree of reliability." *Alabama v. White*, 496

U.S. 325, 330 (1990). The standard takes into account "the totality of the circumstances,"

*Cortez*, 449 U.S. at 417—all the information officers possessed. Although a mere hunch

does not create reasonable suspicion, the level of suspicion required is "considerably less

than proof of wrongdoing by a preponderance of the evidence." *United States v.

Sokolow*, 490 U.S. 1, 7 (1989).

In this case, the officers responded to a 911 call that exhibited adequate indicia of

reliability. Combined with their knowledge of PCP-related drug activity at the address

and in the immediate area, a brief investigative stop was fully justified.

The Supreme Court has noted that "[a]n anonymous tip *alone* seldom demonstrates

the informant's basis of knowledge or veracity," *Navarette v. California*, 572 U.S. 393,

397 (2014), so an anonymous tip is consequently seldom enough for reasonable suspicion.

But the Court has held, "under appropriate circumstances, an anonymous tip can

demonstrate sufficient indicia of reliability to provide reasonable suspicion to make [an]

investigative stop." *Id.* (internal quotation marks omitted). Thus, the Court has held that an anonymous tip can suffice for reasonable suspicion, given some indicia of reliability, though generally some additional information is needed. In this case we have both.

The Supreme Court has plainly held that not all anonymous tips give police reasonable suspicion to make an investigative stop. In *Florida v. J.L.*, 529 U.S. 266 (2000), police received an anonymous phone call alleging that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," *id.* at 268. The call itself did not exhibit any signs of being reliable—there was "no audio recording of the tip, and nothing [was] known about the informant"—so "[a]part from the tip, the officers had no reason to suspect" the young man of any illegal conduct. *Id.* Under these circumstances, the Court unanimously held that the officers lacked reasonable suspicion to frisk the defendant for weapons.

More recently, however, the Supreme Court has under different circumstances found an anonymous tip sufficient under the Fourth Amendment. *See Navarette*, 572 U.S. at 393. The police in *Navarette* received a 911 emergency call stating that a vehicle had just run the caller off the road. The caller provided the dispatcher with the license plate number, which police used to locate and stop the vehicle. The Court found three factors especially relevant: the tipster (1) "claimed eyewitness knowledge of the alleged dangerous driving," (2) "reported the incident soon after she was run off the road," and

(3) "use[d] the 911 emergency system." *Id.* at 399–400; *see also United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011) (laying out similar considerations).

Here, the informant appears to have personally observed Gaines conducting a drug transaction, but we cannot assume that fact when the record is inconclusive. The majority is correct that this is a disputed fact because the caller never explicitly says how he knows of the illegal conduct. The caller was certainly personally observing Gaines while on the phone with the 911 operator and noted that Gaines "just made about 20 dollars." Gov't Ex. 1 at 0:46–48. And he knew how Gaines was dressed and where he had parked his car. But we ultimately cannot be sure the tipster was in a similar position to the caller in *Navarette*.

We have no need to rely on this disputed fact, however, because the claim of eyewitness knowledge is only one indicium of reliability. It cannot be dispositive in either direction because officers have even less ability to confirm a tipster's claim of personal knowledge than other aspects of an anonymous call. And the other two relevant considerations are present. The caller made a "contemporaneous report" of his observations of Gaines's activities, criminal or not, and the caller used the 911 system. *Navarette*, 572 U.S. at 399–400. The anonymous call also contained several other indicia of reliability.

The anonymous tipster described his observations to the emergency operator as he saw them, stating clearly, "I'm watching him right now." Gov't Ex. 1 at 1:39–41. This

4

information is the "sort of contemporaneous report [that] has long been treated as especially reliable." *Navarette*, 572 U.S. at 399. This is because "substantially contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *Id.* at 400 (citing Advisory Committee's Notes on rule of evidence 803(1), which describes "the rationale for the hearsay exception for 'present sense impression[s]'"). Granted, the caller here does not describe any criminal activity contemporaneously with his observations. This weakens the reliability of the criminal allegations. But the contemporaneousness of the caller's noncriminal information increases the overall reliability of the tip because the tipster reported mostly present sense impressions, which "weigh[s] in favor of the *caller*'s veracity." *See id.* (emphasis added). And an anonymous caller's veracity is at least part of the overall reliability inquiry.

Also significant is the caller's use of the 911 emergency system. As the Supreme Court reasoned in *Navarette*, "A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.* For instance, a recorded call "provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution," and FCC regulations prohibit carriers from allowing callers to "block call recipients from obtaining their identifying information." *Id.* at 400–01. This does not "suggest that tips in 911 calls are *per se* reliable," but it does mean that a tipster's use of the 911 system is "one of the

5

relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call."[1]  *Id.* at 401.

In this case, moreover, we have several other indicia of reliability.  First, the caller told the 911 operator where he was.  His first words were, "Uh yes, I'm down here at uh Frank Gill Center . . . Frank Williams Center."  Gov't Ex. 1 at 0:02–07.  He later confirmed this location by exiting the building briefly to verify and report the exact address where he was located.  *See United States v. Madrid*, 713 F.3d 1251, 1260 (10th Cir. 2013) ("giving the address" where the crime took place and the caller's own location "was at least an indicium of reliability") (internal quotation marks omitted).  This, combined with the use of the 911 emergency system, jeopardized his anonymity, which created a "disincentive for making false allegations."  *United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002); *see also United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) ("The fact the caller provided authorities some basis for discovering his identity makes it less likely his tip was phony.").

Second, the caller spent over two minutes on the phone with the 911 operator and answered every question put to him.  When the operator asked what type of car Gaines was driving, the caller answered honestly that he did not know but continued, "I can tell

---

[1]  Gaines's counsel at oral argument contended that a 911 call does not make a tip more reliable because tipsters may use burner phones or other methods to hide detection.  But this was no more true in 2015 when this incident occurred than in 2014 when the Supreme Court decided *Navarette*.

6

ya if you wait." Gov't Ex. 1 at 1:36–37. He also took the time to verify the address of the building where the police needed to go.

Third, the caller did not decline to give his name; the 911 operator simply never asked. This is certainly an indicium of reliability. *See Madrid*, 713 F.3d at 1260 (finding significant that "the 911 operator never asked the caller for his name or other identifying information and there [was] no reason to believe he would not have provided this information if requested"); *United States v. Torres*, 534 F.3d 207, 212 (3d Cir. 2008) (same). Again, these considerations do not make tips reliable *per se*. But a reasonable officer could find an anonymous tip fairly credible when the caller reveals where he is located, jeopardizing his anonymity; does not decline to give any information, especially identifying information; and does not seem in any hurry to make an allegation and hang up.

The officers also had information beyond the anonymous (yet sufficiently reliable) tip on which to rely. They had first-hand officer observation and knowledge. The officers knew which person in the parking lot had been accused of drug dealing: another officer, Officer Wilcox, who at the time was off-duty at the Center, radioed in that the man getting into the Cadillac was the person who had been standing on the street corner dressed in all red when the tipster called. Thus, the officers could be confident that Gaines was the person the caller had accused of criminal activity. *See Cortez*, 449 U.S. at

7

417–18 (officers must have "a particularized and objective basis for suspecting the *particular person* stopped of criminal activity" (emphasis added)).

In addition, the officers had personal knowledge of drug, and specifically PCP-related, activity in the immediate area of the Wilhelmina Gill Center. *See United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) ("[T]he fact that conduct occurs in an area known for criminal activity [is an] appropriate factor[] to consider in determining whether reasonable suspicion exists."). Officer Rowland testified at length at the suppression hearing regarding his knowledge of drug activity near the Center. Officer Davis also testified that she was aware of "a lot of medical-type calls of individuals on PCP, along with complaints of narcotics sales in the area." R., Vol. I at 192.

Gaines now claims that the two officers' knowledge of drug activity at the Center and the immediate area is a disputed issue of fact that must be resolved by the district court. But the officers' testimony that each was aware of this drug activity is unequivocal—and unrefuted.

Officer Rowland laid foundation for a government exhibit that revealed eight police reports to the exact address for drug-related medical treatment that calendar year. The police reports confirm officers had been called to the address for drug overdoses three times in the two months prior to Gaines's arrest. Two of those reports specifically mention that the person receiving treatment had taken or had likely taken PCP, the specific drug the anonymous tipster identified.

8

Officer Rowland also testified extensively about his personal knowledge of these events. He told the court he had personally "responded to calls for service" in the immediate area of the Wilhelmina Gill Center for various things but certainly for "a lot of narcotics complaints." R., Vol. I at 151–52, 154. The officer testified that leading up to the day of the arrest "[w]e had an increased contact with individuals under the influence of PCP." *Id.* at 152. He continued, police received "[n]umerous medical calls, sometimes multiple within a few minutes in that general area of individuals exhibiting behavior that they were under the influence of PCP . . . . So we would usually respond, whether it be a police call or a medical call." *Id.*

We may rely on this record evidence based on the district court's findings of fact and the record evidence. The district court specifically found that Officer Rowland "was familiar with the Wilhelmina Gill Center and the surrounding area" and "had responded to several drug-related calls" at the Center. R., Vol. I at 136. The court also found that "officers had been dispatched to the Wilhelmina Gill Center eight times . . . for medical calls involving reactions to PCP or other substances." *Id.* It is true that the district court did not specifically find that the officers were aware of the PCP-related medical calls established in the police records. But Gaines did not challenge the officers' assertion of this personal knowledge at the suppression hearing; he produced no evidence to contradict the officers' testimony and barely questioned them on the issue during cross-examination. *Id.* at 178–80, 195. The cross-examinations on this point were only to

9

clarify that not all the drug-activity of which the officers knew was specifically PCP related.

The suppression hearing record therefore shows that (1) Officers Rowland and Davis personally responded to service calls in the area of the Center, especially for narcotics complaints; and (2) at least Officer Rowland was aware of the eight police reports he sponsored into evidence of drug related activity at the same address as the arrest happened, including the two service calls for PCP-related drug activity at the Center within two months of Gaines's arrest. This is sufficient evidence to conclude that the officers had additional knowledge, beyond the anonymous phone call, to raise reasonable suspicion that Gaines was selling PCP in the parking lot of the Wilhelmina Gill Center.

Thus, the officers reasonably relied on the anonymous tip in conjunction with their own knowledge because together "the informant's story and the surrounding facts possessed an internal coherence that gave weight to the whole." *United States v. Brown*, 496 F.3d 1070, 1078–79 (10th Cir. 2007). So even "[e]xercising the significant skepticism and careful scrutiny required in the anonymous-informant context," *Copening*, 506 F.3d at 1247 (internal quotation marks omitted), I would affirm on grounds of reasonable suspicion.

10